SUMMARY September 5, 2024 2024COA101 No. 23CA1096, People in Interest of Diaz — Probate — Colorado Uniform Guardianship and Protective Proceedings Act — Guardianship of Incapacitated Person — Preliminaries to Hearing — Visitor’s Report — Colorado Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act — Transfer of Guardianship or Conservatorship to Another State In this adult guardianship case, a division of the court of appeals considers, for the first time, whether the probate court possesses the legal authority to transfer a ward’s dwelling place to a foreign country against the ward’s wishes. The division concludes that the Colorado Uniform Guardianship and Protective Proceedings Act (CUGPPA) and the Colorado Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (CUAGPPJA) authorize a probate court to transfer guardianship proceedings to a foreign jurisdiction so long as the court receives a visitor’s report that complies with section 15-14-305, C.R.S. 2023 and complies with The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion. 
 the procedures set forth in section 15-14.5-301. Because the court did not receive a statutorily compliant visitor’s report and did not follow the procedures outlined in 15-14.5-301, we reverse the order and remand for the court to obtain a complete court visitor’s report addressing the suitability of the proposed change of dwelling place and to conduct a hearing as required by sections 15-14-304 and -
305. If the court determines that a transfer of the ward’s dwelling place is in his best interests, then the court must follow the procedures outlined in section 15-14.5-301. 
 COLORADO COURT OF APPEALS 2024COA101 Court of Appeals No. 23CA1096 City and County of Denver Probate Court No. 22PR31552 Honorable Beth A. Tomerlin, Magistrate In the Interest of Humberto Gonzalez Diaz, Ward, Humberto Gonzalez Diaz, Appellant, v. Jose Guzman Santoyo, Guardian, and Ayo Labode, Guardian Ad Litem, Appellees. ORDER REVERSED AND CASE REMANDED WITH DIRECTIONS Division V Opinion by JUDGE FREYRE Brown and Johnson, JJ., concur Announced September 5, 2024 Conover Law, LLC, Tammy D. Conover, Scott H. Challinor, Greenwood Village, Colorado, for Appellant No Appearance for Appellees 
1 ¶ 1 In this adult guardianship case, appellant and ward, Humberto Gonzalez Diaz, appeals the probate court’s order authorizing his guardian to move him to Mexico against his wishes. As a matter of first impression, we conclude that the Colorado Uniform Guardianship and Protective Proceedings Act (the guardianship act) and the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (the jurisdiction act) empower a court to authorize a guardian to move the ward’s dwelling place to a foreign jurisdiction so long as the court receives a visitor’s report that complies with section 15-14-305, C.R.S. 2024, and finds that such a move is in the ward’s best interests. As part of that consideration, the court may, but is not required to, consider whether a transfer of the guardianship proceeding is appropriate under section 15-14.5-301, C.R.S. 2024. ¶ 2 Because the probate court did not receive a statutorily compliant visitor’s report, we reverse the order and remand for the court to obtain a complete court visitor’s report addressing the suitability of the proposed change of dwelling place and to conduct a hearing as required by section 15-14-305. If, after reviewing the 
2 report, the court determines that moving the ward’s dwelling place is in his best interests, the court may, in its discretion, determine whether a transfer of the guardianship proceeding is also appropriate. I. Background ¶ 3 Diaz is a seventy-year-old Hispanic male who emigrated from Mexico to the United States when he was a teenager. He moved to Colorado when he was thirty-five years old and began working in maintenance and food preparation jobs in casinos. Diaz married a woman he met while working at the casinos and, as a result of the union, became a lawful permanent resident. He sent money he earned from working at the casinos back to his family in Mexico to maintain the family home. ¶ 4 Diaz developed alcoholism while working at the casinos. His alcoholism caused tension in his marriage, and his wife eventually sold the family home and moved out.
1 After his wife left, Diaz 1 There is no indication from the record that Diaz and his wife are legally divorced. 
3 became homeless and lived in and out of shelters. During this time, he received senior support services in central Denver. ¶ 5 In July 2021, Diaz was incarcerated for threatening a person with a knife at a shelter. A mental health certification was initiated against Diaz in Denver Probate Court Case No. 22MH757. During that proceeding, the court appointed Ayo Labode as guardian ad litem for Diaz. ¶ 6 In November 2022, Labode filed a petition for appointment of a special conservator for purposes of accessing funds to pay for a professional assessment of Diaz’s mental capacity and the necessity of appointment of a guardian. A special conservator was appointed, and the necessary funds were used to pay for a professional assessment of Diaz. ¶ 7 Licensed psychologist Dr. David Mirich performed a neuropsychological and capacity assessment of Diaz in December 2022. In his report, Dr. Mirich concluded that Diaz met the diagnostic criteria for major neurocognitive disorder and that he qualified as an “[i]ncapacitated person” under section 15-14-102(5), C.R.S. 2024, of the probate code. 
4 ¶ 8 In reaching his diagnosis, Dr. Mirich opined as follows: • Diaz suffers from “severe” cognitive and neurocognitive deficits that “preclude his ability to safely live independently or to make sound financial, medical or placement decisions for himself”; • Diaz “does not have the capacity to meaningfully direct his council [sic] or express a preference for the nomination of fiduciaries in his case”; • Diaz “will certainly require a permanent Guardian to assist him in managing his affairs”; and • Diaz “will require a placement such as a locked memory unit to prevent wander, a relapse with drugs and alcohol and to limit his ability to put him or others in danger.” ¶ 9 Following the assessment, Labode petitioned the court to appoint Diaz’s brother-in-law by marriage, Jose Guzman Santoyo, as Diaz’s guardian. In addition to requesting appointment of a guardian, Labode requested authorization for the guardian to “transport [Diaz] from the Denver Detention Center [and] travel anywhere within the United States and Mexico.” The court 
5 appointed a court visitor, Brian Wallman, to investigate the allegations in the petition and to prepare a report. ¶ 10 Wallman filed a report in March 2023. In the first section of his report, Wallman identified as significant concerns Diaz’s diagnosis of major neurocognitive disorder following his psychological assessment and that Diaz was currently being held in the Denver Detention Center, where he had been incarcerated since July 2021. Wallman also noted Diaz’s personal history before incarceration, including alcoholism and homelessness. Wallman then noted that the proposed guardian, Guzman Santoyo, intended to drive Diaz to Guanajuato, Mexico, to live with his sisters and that Diaz objected to the move. ¶ 11 Wallman interviewed Diaz, Guzman Santoyo, and Labode. Diaz was not oriented to time and place during the interview, and he did not recall who was proposed as his guardian. When asked how he felt about the proposed guardianship, Diaz responded, “I don’t like it there (in Mexico).” Guzman Santoyo told Wallman that “[Diaz] has a mental problem” and that Diaz had been away from the family who lived in Mexico for a long time but had sent money 
6 back to Mexico to pay for the family home. Guzman Santoyo said that he wanted to be there for Diaz “[t]o take him from jail, home to Mexico.” Labode told Wallman that the purpose of the guardianship was “to have [Diaz] released from the Detention Center and have [Guzman Santoyo] return him home to be cared for by his sisters in Mexico.” ¶ 12 Wallman next reported on the condition of Diaz’s current residence at the Denver Detention Center, saying that “[j]ail may not be the appropriate setting to meet the needs of [Daiz] because of his major neurocognitive disorder.” Relevant here, Wallman left blank the entire section of his report requiring him to report on the condition of Diaz’s proposed residence. ¶ 13 Subsequently, the court appointed Diaz an attorney and set a hearing on the guardianship petition. Before the hearing, Diaz’s counsel filed an objection to the petition in which he contested only the petition’s request for authority for the guardian to move Diaz to Mexico against his wishes.
2 2 Diaz did not contest the appointment of a guardian or the appointment of Guzman Santoyo as his guardian. 
7 ¶ 14 Counsel elaborated on his objection at the hearing. He argued that the request constituted “an involuntary repatriation order” where no such order had been issued by immigration authorities. He also argued that the request constituted “extraordinary relief” that was not authorized by the probate code. As well, counsel articulated his concerns that (1) Labode proposed terminating the guardianship upon moving Diaz, without any ongoing or transfer of court supervision or authority; and (2) there was no evidence that anyone had visited the proposed residence to ensure it met Diaz’s needs. In addition to counsel’s arguments, Diaz said on the record, “I don’t like Guanajuato. I like Colorado.” ¶ 15 Labode argued that the court was empowered to grant Guzman Santoyo the authority to move Diaz to Mexico under section 15-14-315, C.R.S. 2024. She further argued that, due to Diaz’s recent history of homelessness, it was in his best interest to “be in a place where he is loved and appreciated, where family wants to provide the care and oversight that [he] clearly does need.” ¶ 16 In addition to the parties’ arguments, the court heard testimony from Rita Gonzalez, a relative living in Chicago who was 
8 coordinating with Diaz’s family in Mexico. Gonzalez testified that Diaz’s sisters contacted her to help find Diaz because they didn’t want him to be in a bad situation and they wanted him to come to Mexico to be with them and let them care for him. Gonzalez indicated that neither she nor the sisters had firsthand knowledge of or experience dealing with Diaz’s specific medical or psychiatric needs; her knowledge of Diaz’s condition was through speaking with the attorneys, and the sisters’ knowledge was limited to what Gonzalez had told them. ¶ 17 During closing, Labode acknowledged that no one had visited the sisters’ home to assess its suitability, but she said that doing so “are not the circumstances under which we live.” She further acknowledged that Diaz previously told her and others “that he’d rather live on the streets unprotected in Denver than in Mexico.” Regardless, Labode urged the court to consider Diaz’s numerous hospitalizations and to find that moving Diaz to Mexico would be in his best interests “to be among people who are familiar — who have knowledge of his challenges that he has demonstrated today and who care about him.” 
9 ¶ 18 Diaz’s counsel argued that notwithstanding Diaz’s sisters’ good intentions, placement with them would be insufficient to meet Diaz’s needs because they had spent very little time with him and had very little understanding of the significance and severity of his challenges. Counsel further argued that sending Diaz to Mexico against his wishes and without the court maintaining the guardianship beyond placement in Mexico would put Diaz “out of any ability to have oversight.” ¶ 19 Later that day, the court issued a written order granting the petition and appointing Guzman Santoyo as Diaz’s guardian. It said it had reviewed and considered Diaz’s neuropsychological assessment and the court visitor’s report, and it found that both supported granting the petition. ¶ 20 The court began by finding that sections 15-14-301, 15-14-
315(1)(b), and 15-14.5-103, C.R.S. 2024, permit a court to authorize a guardian to move a ward’s custodial dwelling outside of Colorado and even to a foreign country. The court relied on the absence of language in the probate code prohibiting it from doing so. 
10 ¶ 21 The court also found that Diaz was an incapacitated person under section 15-14-102(5) and that he “is unable to make decisions to such an extent that he lacks the ability to satisfy essential requirements for his health, safety and self-care,” including “the decision on where to reside and where to establish his custodial dwelling.” The court also found that the court-
appointed guardian was vested with the authority to establish Diaz’s place of custodial dwelling. ¶ 22 The court next weighed Diaz’s best interests against his adamant objection to returning to Mexico and his desire to remain in Colorado. The court found that Diaz was “extremely vulnerable,” noting that he was presently in jail and had been previously homeless and received services from a clinic that placed him on a “Do Not Admit” list due to his violent tendencies. Balancing Diaz’s best interests against his stated wish to remain in Colorado, the court found that his current circumstances (“remaining in jail or discharging to homelessness without any care or support with his current diagnosis and presentation”) and the lack of appropriate 
11 services in Colorado rendered the relocation to Mexico in his best interests. ¶ 23 The court ordered that “[t]he Guardian is authorized to transport the Respondent/Ward outside the State of Colorado and to transport the Respondent/Ward internationally including but not limited to driving the Respondent/Ward from Denver, Colorado to Guanajuato, Mexico.” ¶ 24 Approximately two months after the court issued its order, Guzman Santoyo filed a notice of change of address for Diaz, indicating that he now resides with his sisters in Guanajuato, Mexico.
3 II. Guardianship Proceeding ¶ 25 Diaz challenges the probate court’s order on four grounds. Resolving his challenges requires us to interpret two acts — the guardianship act and the jurisdiction act. The guardianship act 3 Guzman Santoyo’s letters of guardianship were set to expire on August 16, 2023, and there is no indication in the record that the guardianship was renewed. The record shows that the probate court issued a delay prevention order because Guzman Santoyo failed to file his initial guardianship report due in July 2023. There is no evidence in the record that he ever filed this report. 
12 comprehensively addresses all aspects of guardianships and protective proceedings for both adults and minors. As relevant here, it sets forth the requirements for the appointment of a guardian, the duties of the guardian, and the powers of the guardian (including seeking to move the ward’s dwelling place outside Colorado). §§ 15-14-101 to -434, C.R.S. 2024. Notably, “[t]he guardianship continues until terminated, without regard to the location of the guardian or ward.” § 15-14-301. ¶ 26 The jurisdiction act is narrower in scope and applies only to jurisdiction and related issues in adult proceedings. As relevant here, it facilitates cooperation between courts in different states, specifies which court has jurisdiction to appoint a guardian, and specifies the requirements for transferring a guardianship proceeding. §§ 15-14.5-101 to -503, C.R.S. 2024. ¶ 27 Diaz first contends that the probate court misinterpreted the guardianship act and the jurisdiction act as permitting it to authorize a guardian to move a ward out of the United States at the initial appointment hearing, despite the ward’s expressly stated wishes and without transferring the guardianship proceeding to the 
13 foreign jurisdiction to which the ward is being moved. Second, he contends that the probate court abused its discretion by finding that moving his dwelling place to Mexico was in his best interests. Third, he contends that the court abused its discretion by authorizing his guardian to move him to Mexico when the court visitor’s report did not comply with section 15-14-305. Last, he contends that the probate court erred by not applying the clear and convincing evidentiary standard when it granted the guardian the authority to move him to Mexico and that the record does not support that doing so was in his best interests under that heightened standard. ¶ 28 We begin by addressing the court’s authority to permit a guardian to move a ward’s dwelling place to a foreign jurisdiction because our resolution of this issue impacts the outcome of the remaining issues. We conclude that the probate court is authorized to allow the guardian to move Diaz’s dwelling place to Mexico, but we agree with Diaz that it may not do so without first receiving a statutorily compliant visitor’s report. However, we reject Diaz’s arguments that the court may not authorize a guardian to move the 
14 ward’s dwelling place at the initial appointment proceeding and that the court must transfer the guardianship proceeding under the jurisdiction act when authorizing a guardian to move a ward’s dwelling place to a foreign jurisdiction. Instead, we conclude that the court may, in its discretion, condition an order authorizing a guardian to move a ward’s dwelling place on the transfer of the guardianship proceeding to the foreign jurisdiction when doing so is in the ward’s best interests. ¶ 29 Next, we agree with Diaz that the visitor’s report did not comply with section 15-14-305. Because a visitor and their report constitute the information gathering arm of the guardianship appointment process that protects the ward’s right to due process, a deficient report necessarily affects the court’s decisions to appoint a guardian and to enter orders in the ward’s best interests. Therefore, we reverse the order and remand the case for preparation of a statutorily compliant visitor’s report and a new hearing. ¶ 30 Finally, because we are reversing the probate court’s order, we need not address whether Diaz’s move to Mexico was in his best 
15 interests or whether the court properly applied the heightened evidentiary standard. A. Court’s Power to Authorize a Guardian to Move a Ward to a Foreign Jurisdiction ¶ 31 Diaz contends that the probate court misinterpreted the guardianship act and the jurisdiction act as permitting it to authorize the guardian to move his dwelling place to Mexico against his stated wishes. He further argues that if the court possessed such authority, it was also required to transfer the guardianship proceeding. We disagree with both contentions. 1. Standard of Review and Applicable Law ¶ 32 Statutory interpretation is a question of law that we review de novo. Trujillo v. Colo. Div. of Ins., 2014 CO 17, ¶ 12. When interpreting a statute, “[o]ur objective is to effectuate the intent and purpose of the General Assembly.” Id. “To determine the legislature’s intent, we look first to the plain language of the statute.” People in Interest of J.W. v. C.O., 2017 CO 105, ¶ 18. Where the statutory language is clear and unambiguous, we apply the plain and ordinary meaning of the provision. Trujillo, ¶ 12. We construe the statute as a whole in an effort to give consistent, 
16 harmonious, and sensible effect to all its parts, and we read words and phrases in context and construe them according to the rules of grammar and common usage. People v. Banuelos-Landa, 109 P.3d 1039, 1041 (Colo. App. 2004). We “respect the legislature’s choice of language,” and we “do not add words to the statute or subtract words from it.” Turbyne v. People, 151 P.3d 563, 567-68 (Colo. 2007). And we avoid constructions that render words superfluous or produce absurd results. People v. Burnett, 2019 CO 2, ¶¶ 20-21. ¶ 33 If the statutory language is clear and unambiguous, we do not engage in further statutory analysis. Romero v. People, 179 P.3d 984, 986 (Colo. 2007). “But if the statutory language is susceptible of more than one reasonable interpretation, it is ambiguous and we may apply other rules of statutory interpretation.” Miller v. Hancock, 2017 COA 141, ¶ 24 (quoting People v. Diaz, 2015 CO 28, ¶ 13). “The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.” Id. (quoting Diaz, ¶ 13). 
17 2. Analysis ¶ 34 Diaz argues that section 15-14-315 of the guardianship act does not empower a guardian to move a ward out of the United States against his wishes. He further argues that section 15-14.5-
103, authorizing a court to treat a foreign country like a state under the jurisdiction act, is inapplicable because “the primary objective of the [jurisdiction act] is to ascertain jurisdiction between a domestic and foreign court should such a conflict arise.” We are not persuaded because Diaz’s interpretation ignores the plain language of section 15-14-315(1)(b) and fails to construe it harmoniously with section 15-14.5-103. ¶ 35 We begin with section 15-14-315, entitled “Powers of guardian,” which identifies the actions a guardian may undertake for a ward. As relevant here, subsection (1)(b) permits a guardian to, [i]f otherwise consistent with the terms of any order by a court of competent jurisdiction relating to custody of the ward, take custody of the ward and establish the ward’s place of custodial dwelling, but may only establish or move the ward’s place of dwelling outside this state upon express authorization of the court. § 15-14-315(1)(b). 
18 ¶ 36 The plain language of the statute authorizes a move “outside this state” without limitation. It does not, for example, authorize a move only “to another state” or “within the United States” or “outside this state but not to a foreign country.” Diaz’s interpretation asks us to read words of limitation into the statute that do not exist. See Turbyne, 151 P.3d at 567-68. Therefore, we conclude that the plain meaning of “outside this state” includes a foreign country. ¶ 37 Guanajuato, Mexico, is “outside this state.” § 15-14-315(1)(b). Although Diaz makes compelling policy arguments against the probate court’s “involuntary repatriation” of Diaz over his objection, he cites no legal authority limiting the court’s ability to authorize his guardian to move his dwelling place to Mexico. See Trujillo, ¶ 12 (the legislature sets policy and we must apply statutes as written). ¶ 38 Our interpretation is supported by the plain language of section 15-14.5-103, which provides that a court “may treat a foreign country as if it were a state for the purpose of applying this part 1 and parts 2, 3, and 5 of [the jurisdiction act].” We acknowledge that section 15-14.5-103 expressly allows a court to 
19 treat a foreign country as if it were a state only for purposes of the jurisdiction act; by its plain language, it does not authorize a court to treat a foreign country as if it were a state for purposes of the guardianship act. But as we explain below, the jurisdiction act, which applies to adult guardianship proceedings governed by the guardianship act, provides that a guardianship can be transferred to another “state” (which includes a “foreign country,” § 15-14.5-
103) when, among other things, a ward is expected to move there permanently. See § 15-14.5-301(4)(a). It would be nonsensical to conclude that a court cannot authorize a guardian to move a ward to a foreign country under the guardianship act when such a move is contemplated by the jurisdiction act. See Burnett, ¶¶ 20-21; People v. Riggs, 87 P.3d 109, 117 (Colo. 2004) (we will not interpret a statute in a manner that leads to an absurd or unreasonable result). ¶ 39 On this point, we reject Diaz’s argument that the court “incorrectly interpreted [the guardianship act’s] silence regarding the authority to move a ward abroad against his or her wishes as an affirmative grant of such authority.” We note that the two acts are 
20 not, in fact, silent about a guardian moving a ward abroad. As noted above, section 15-14-315(1)(b) and section 15-14.5-103, when read together, demonstrate that an international move was contemplated by the General Assembly. If the General Assembly had intended to preclude a court from moving a ward abroad, it would have said so. See People v. Tomaske, 2022 COA 52, ¶¶ 23-
24. ¶ 40 Similarly, we reject Diaz’s argument that a court must transfer the guardianship proceeding to the foreign jurisdiction when authorizing a guardian to move a ward’s dwelling place. To begin, nothing in section 15-14-315(1)(b) conditions the court’s authority to allow a guardian to move a ward’s dwelling place out of the state on the court’s compliance with the procedures in section 15-14.5-
301, which governs when a guardian petitions the court to transfer the guardianship proceedings to another state or foreign country. Had the General Assembly intended to cross-reference article 14.5, it knew how to do so. See, e.g., § 15-14-106(2), C.R.S. 2024 (referring to article 14.5 to determine subject matter jurisdiction over adult guardianship proceedings); § 15-14-107(2)(b), C.R.S. 
21 2024 (referring to article 14.5 to determine what the court must do if a guardianship proceeding is pending in another state or foreign country and a petition for guardianship is filed in a Colorado court). Again, we may not add words to the statute that do not exist. Turbyne, 151 P.3d at 567-68. ¶ 41 Additionally, the provisions of title 15, articles 14 and 14.5, when read together, see Banuelos-Landa, 109 P.3d at 1041, contemplate that the court may retain jurisdiction over the guardianship proceeding, even if it has authorized the guardian to move the ward’s dwelling place to another state or foreign country. For example, subject matter jurisdiction over adult guardianship proceedings is determined by the jurisdiction act. §§ 15-14-106, 15-14.5-202, C.R.S. 2024. Under article 14.5, a Colorado court has jurisdiction to appoint a guardian if, as relevant here, Colorado is the respondent’s home state. § 15-14.5-203, C.R.S. 2024. And the respondent’s home state is the state in which the respondent was physically present for at least six consecutive months immediately before the filing of the petition. § 15-14.5-201(1)(b), C.R.S. 2024. Once the court has appointed a guardian, it “has exclusive and 
22 continuing jurisdiction over the proceeding until it is terminated.” § 15-14.5-205, C.R.S. 2024. And the guardianship terminates only upon the death of the ward or upon order of the court. § 15-14-
318, C.R.S. 2024. ¶ 42 Notably, nothing in the statute indicates that a state cannot maintain jurisdiction if the ward’s dwelling place is moved out of the state. Indeed, section 15-14-301 expressly provides that once a guardian is appointed by order of the court, “[t]he guardianship continues until terminated, without regard to the location of the guardian or ward.” (Emphasis added.) ¶ 43 Relatedly, a Colorado court having jurisdiction to appoint a guardian “may decline to exercise its jurisdiction” if it determines that a court of another state is a more appropriate forum. § 15-
14.5-206(1), C.R.S. 2024 (emphasis added). In this context, “[a] court of this state may treat a foreign country as if it were a state.” § 15-14.5-103. In determining whether it is an appropriate forum, the court should consider several nonexhaustive factors, including the distance of the respondent from the court in each state or foreign country, the nature and location of the evidence, and the 
23 court’s ability to monitor the conduct of any guardian it appoints. § 15-14.5-206(3). If the court declines jurisdiction, it must either dismiss or stay the proceeding, and it may “impose any condition the court considers just and proper, including the condition that a petition for the appointment of a guardian . . . be filed promptly in another state [or foreign country].” § 15-14.5-206(2). ¶ 44 Conspicuously, the statutory language regarding deferring to another appropriate forum is permissive: the court may decline jurisdiction, but it is not required to do so. § 15-14.5-206(1); In re Marriage of Vega, 2021 COA 99, ¶ 18 (“The legislature’s use of the word ‘may’ is permissive; it is ‘generally indicative of a grant of discretion or choice among alternatives.’” (quoting A.S. v. People, 2013 CO 63, ¶ 21)). It logically follows that if the court does not decline to exercise jurisdiction, then it maintains exclusive and continuing jurisdiction, regardless of the location of the guardian or the ward. See §§ 15-14-301, 15-14.5-205. ¶ 45 Having concluded that a court is not required to transfer the guardianship proceeding when authorizing a guardian to move the ward’s dwelling place, we conclude that the court retains the 
24 discretion to do so if the court determines that it is in the ward’s best interests. Section 15-14.5-301 provides the procedures to transfer a guardianship of a ward to another state or foreign country, and it contemplates moving a ward’s dwelling place as part of such proceeding, as indicated by the italicized language below: (1) A guardian or conservator appointed in this state may petition the court to transfer the guardianship or conservatorship to another state.[
4
] (2) Notice of a petition under subsection (1) of this section must be given to the persons that would be entitled to notice of a petition in this state for the appointment of a guardian . . . . (3) On the court’s own motion or on request of the guardian . . . , the incapacitated or protected person, or other person required to be notified of the petition, the court shall hold a hearing on a petition filed pursuant to subsection (1) of this section. (4) The court shall issue an order provisionally granting a petition to transfer a guardianship and shall direct the guardian to petition for guardianship in the other state if the court is satisfied that the guardianship will be accepted by the court in the other state and the court finds that: 4 Recall that section 15-14.5-103, C.R.S. 2024, provides that a court “may treat a foreign country as if it were a state for the purpose of applying” this provision. 
25 (a) The incapacitated person is physically present in or is reasonably expected to move permanently to the other state; (b) An objection to the transfer has not been made or, if an objection has been made, the objector has not established that the transfer would be contrary to the interests of the incapacitated person; and (c) Plans for care and services for the incapacitated person in the other state are reasonable and sufficient. . . . . (6) The court shall issue a final order confirming the transfer and terminating the guardianship . . . upon its receipt of: (a) A provisional order accepting the proceeding from the court to which the proceeding is to be transferred which is issued under provisions similar to section 15-14.5-
302; and (b) The documents required to terminate a guardianship . . . in this state. § 15-14.5-301 (emphasis added). ¶ 46 These procedures adequately address the policy concerns implicated by an international transfer of guardianship that Diaz raises on appeal, including assessing the appropriateness of a transfer, determining whether the ward’s needs can be met in the 
26 foreign jurisdiction, and ensuring that plans for care and services for the ward in the foreign jurisdiction are reasonable and sufficient. Moreover, section 15-14.5-301 requires the court to make findings about objections to the transfer and to permanently transfer the guardianship only when the foreign jurisdiction issues a provisional order accepting the proceeding. These requirements ensure that the guardianship proceeding is transferred to a foreign jurisdiction with statutory safeguards in place to guarantee ongoing protection and monitoring of the ward. And because the purpose of both the guardianship and jurisdiction acts is to ensure the ward’s ongoing protection, we strongly encourage the court to consider whether a transfer of the proceedings is possible and appropriate when deciding whether authorizing a guardian to move the ward’s dwelling place outside the state is in the ward’s best interest. ¶ 47 Finally, we reject Diaz’s contention that a court may never authorize a guardian to move the ward’s dwelling place to a foreign jurisdiction at the initial appointment hearing. He cites no authority, and we are not aware of any, that prohibits a court from authorizing the guardian, upon initial appointment, to establish or 
27 move the ward’s dwelling place outside Colorado. See § 15-14-311, C.R.S. 2024 (requiring the court to enter an order of appointment after a hearing on the guardianship petition granting a guardian the powers necessitated by the ward’s limitations and needs); § 15-14-
315(1)(b) (a guardian has the power to move a ward’s place of custodial dwelling outside Colorado upon express authorization of the court). ¶ 48 Accordingly, we conclude that the court possessed the legal authority under the guardianship and jurisdiction acts to permit the guardian to move Diaz to Mexico. We further conclude that the court may authorize a guardian to move a ward’s dwelling place at the initial appointment proceeding if it has received a statutorily compliant visitor’s report and has determined that such a transfer is in the ward’s best interests. But for the reasons described below, we conclude that the court did not receive a statutorily compliant visitor’s report in this case. B. Court Visitor’s Report ¶ 49 Diaz argues that the probate court misapplied the guardianship act and violated his due process rights by authorizing 
28 his guardian to move him to Mexico against his wishes “even though the Court Visitor did not visit [his] proposed residence in Mexico and did not report to the Probate Court regarding whether such residence meets [his] needs.” We construe his argument as a challenge to the visitor’s report and agree that it was statutorily insufficient and that the probate court erred in relying on it to make its determination. 1. Standard of Review and Applicable Law ¶ 50 We review a district court’s appointment of a guardian for an abuse of discretion. In re Estate of Runyon, 2014 COA 181, ¶ 9. A court abuses its discretion if the appointment is manifestly arbitrary, unreasonable, or unfair, or if the court misconstrues or misapplies the law in entering the appointment order. Id. ¶ 51 We review the district court’s application of law de novo. Arguello v. Balsick, 2019 COA 20M, ¶ 22. Likewise, we review de novo whether the court properly interpreted and applied the relevant statute. Id. at ¶ 14 (citing Miller, ¶ 24). We apply the rules of statutory construction stated in the previous section. 
29 ¶ 52 Section 15-14-305 governs the preliminaries to guardianship hearings. Upon receipt of a petition to establish a guardianship, “the court shall set a date and time for hearing the petition and appoint a visitor.” § 15-14-305(1) (emphasis added); see Arguello, ¶¶ 1, 30 (the plain language of sections 15-14-304 and -305, C.R.S. 2024, requires a court to appoint a court visitor and to receive the visitor’s report before appointing a guardian). The court visitor must have training that is deemed appropriate by the court. Id. ¶ 53 The court visitor’s duties and reporting requirements are set forth in subsections (3) and (4) of section 15-14-305. As pertinent here, the court visitor shall perform the following: (a) Interview the petitioner and the proposed guardian; (b) Visit the respondent’s present dwelling and any dwelling in which the respondent will live, if known, if the appointment is made; (c) Obtain information from any physician or other person who is known to have treated, advised, or assessed the respondent’s relevant physical or mental condition; and (d) Make any other investigation the court directs. § 15-14-305(4) (emphasis added). 
30 ¶ 54 Upon completing the foregoing investigatory steps, the court visitor “shall promptly file a report in writing with the court.” § 15-
14-305(5). The court visitor’s report must include, among other things, “[a] statement as to whether the proposed dwelling meets the respondent’s individual needs.” § 15-14-305(5)(e). 2. Analysis ¶ 55 We conclude that the probate court abused its discretion by not complying with the “statutory vetting procedures” outlined in section 15-14-305, Arguello, ¶ 1 — namely, the court did not receive a statutorily compliant visitor’s report before appointing the guardian. ¶ 56 In Arguello, a division of this court partially reversed a district court’s order appointing a guardian because the court appointed a guardian without first appointing a court visitor and reviewing the visitor’s report. Id. In its discussion, the division summarized the legislative purpose and context of the Uniform Guardianship and Protective Proceedings Act (Unif. L. Comm’n 1997) (UGPPA).
5 The 5 “The [guardianship act] is based on the Uniform Guardianship and Protective Proceedings [Act] of 1997 (UGPPA) law and, 
31 division found the official comments to sections 304 and 305 of UGPPA (sections 15-14-304 and -305 under Colorado law), which, it noted, expanded the mandatory nature of the vetting process, particularly persuasive. The comment to section 304 states that the petition for appointment “must” contain the information listed because the information is useful to the court in making an informed decision regarding the appointment. The comment to 305 states that “[a]ppointment of a visitor is mandatory . . . . The visitor serves as the information gathering arm of the court.” And it states that the visitor’s report “must be in writing and include a list of recommendations or statements.” Arguello, ¶ 27 (quoting UGPPA § 305 cmt.). ¶ 57 Against this statutory backdrop, the division concluded that a court is required to appoint a court visitor under the plain language of section 15-14-305(1). But the mere appointment of a court visitor is not itself sufficient: the court is required to follow the “statutory vetting procedures” outlined in sections 15-14-304 and - therefore, ‘consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it’ when applying and construing it.” Arguello v. Balsick, 2019 COA 20M, ¶ 23 (quoting § 15-14-121, C.R.S. 2024). 
32 305 and to receive a visitor’s report before appointing a guardian. Arguello, ¶¶ 1, 30. ¶ 58 The division reasoned that the General Assembly’s use of the word “shall” in sections 15-14-304 and -305 indicates a mandatory requirement and that interpreting the statute to require appointment of a court visitor prior to appointment of a guardian is “consistent with the official comments to the UGPPA explaining that the visitor is the information gathering arm of the process who protects the incapacitated person’s right to due process.” Id. at ¶ 30. Additionally, the division noted that neither the statute nor the official comments contain an exception to the process that would apply to the case. Id. ¶ 59 The plain language of section 15-14-305 requires the court visitor’s report to include a statement that the court visitor visited the proposed dwelling and a statement about whether the proposed dwelling meets the respondent’s individual needs. § 15-14-
305(4)(b), (5)(e). Indeed, subsections (4)(b) and (5)(e) contain mandatory language — “shall” and “must,” respectively — which, when paired with apparent requirements, courts generally construe 
33 as the General Assembly’s intent to make compliance with those requirements mandatory. See Arguello, ¶ 30; see also People v. Rice, 2015 COA 168, ¶ 13 (citing People v. Durapau, 280 P.3d 42, 46 (Colo. App. 2011)); Silverview at Overlook, LLC v. Overlook at Mt. Crested Butte Ltd. Liab. Co., 97 P.3d 252, 255 (Colo. App. 2004) (“Use of the word ‘must’ connotes a requirement that is mandatory and not subject to equivocation.”). ¶ 60 Here, the court visitor’s report did not say that he visited the sisters’ home, and he left blank the entire section pertaining to the suitability of their home. Further, there is no explanation in his report about why he did not visit the sisters’ residence or any alternative methods he pursued to determine suitability. Nor does the record contain testimony or argument that would explain the absence of this information. Finally, the court did not inquire about the suitability of the proposed dwelling or even note that this information was missing. ¶ 61 On this record, we conclude that the court erred because it relied on a court visitor’s report that was insufficient under subsections (4)(b) and (5)(e) of section 15-14-305. Accordingly, we 
34 reverse the court’s order appointing the guardian and remand the case for the visitor to prepare a visitor’s report that complies with the statute and for a hearing on the appointment of a guardian. III. Disposition ¶ 62 We reverse the order and remand the case for the probate court to obtain a statutorily compliant visitor’s report and to conduct a new hearing under section 15-14-305. If, after receiving a compliant visitor’s report and conducting an investigatory hearing, the court determines that authorizing Diaz’s guardian to move his dwelling place out of the country is in his best interests, the court has discretion to condition the move on the transfer of the guardianship proceeding to the foreign jurisdiction. JUDGE BROWN and JUDGE JOHNSON concur.