J-A28009-25

2026 PA Super 124

IN RE: MARY D. AVERY, AN : IN THE SUPERIOR COURT OF
ALLEGED INCAPACITATED PERSON : PENNSYLVANIA
:
:
:
APPEAL OF: JIMMY DORSEY AND :
KAREN L. DORSEY : No. 191 MDA 2025

Appeal from the Order Entered January 8, 2025
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88000

BEFORE: KUNSELMAN, J., McLAUGHLIN, J., and LANE, J.

OPINION BY KUNSELMAN, J.: **FILED: JUNE 16, 2026**

## I. Introduction

In this guardianship proceeding, Jimmy Dorsey and his wife, Karen L. Dorsey ("the Dorseys"), appeal from an order denying their petition to charge the Estate of Mary D. Avery (the Dorseys' Ward and Mr. Dorsey's mother) $79,790.99 in attorneys' fees and costs. Before addressing the merits of that order, we must determine whether New York, Pennsylvania, or South Carolina had jurisdiction over Ms. Avery's status and estate on the date the Dorseys commenced this proceeding. As explained below, that jurisdictional question is non-waivable, and this Court may raise it *sua sponte*. However, to decide it, we require the orphans' court to develop a record and make findings of fact. Thus, we remand for an evidentiary hearing.

## II. Factual & Procedural Background

Ms. Avery has two adult children, Mr. Dorsey and Kecia Dorsey-Rosa. Her son lives in Harrisburg, and her daughter lives in the Bronx, New York. Around 2000, after Ms. Avery's husband died, she moved to South Carolina

and purchased a home, where she lived with her partner, Edna,[1] for 19 years. **See** The Dorseys' 7/12/22 Hearing Ex. 1 at 2.

In 2010, Ms. Avery's relationship with her son soured. He ended all contact with his mother "for 10 to 12 years, up until she called [him] in May of 2021." N.T., 7/12/22, at 86. Ms. Avery was "crying, saying that she needed help," and said, "I can't take it anymore . . . I don't want any responsibility. I need somebody to take charge." **Id.** at 86-87. Ms. Avery was living by herself at that point, because Edna "was in the hospital." **Id.** at 129.

On May 19, 2021, the Dorseys drove to South Carolina to "see what [they] could do to help." **Id.** at 87; **see also id.** at 138. Ms. Avery showed signs of confusion, poor hygiene, and malnutrition; her house and finances were in disarray. **See id.** at 88-90. The Dorseys "stayed for about a week." They decided that they needed to take Ms. Avery home with them, because she could not stay in South Carolina alone. **Id.** at 89. Mr. Dorsey told Ms. Avery the move was "temporary until we can get your affairs squared away." **Id.** at 91. Around May 26, 2021, they "brought her to Pennsylvania" to stay with them. **Id.**

A few weeks later, on June 14, Edna died. **See** The Dorseys' 7/12/22 Hearing Ex. 1 at 2. Three days after that, Ms. Avery signed a power of attorney in favor of the Dorseys as her plenary agents. During that same time, Ms. Avery underwent cognitive exams. A psychiatrist "determined that

---

[1] The record does not appear to contain Edna's last name.

[she] suffer[ed] from Alzheimer's disease, anxiety, and sleep disturbances." Orphans' Court Opinion, 9/26/22, at 2. The Dorseys used their power of attorney to sell Ms. Avery's South Carolina home for $168,082.08. *See* The Dorseys' Petition for the Appointment of Emergency Co-Guardians Ex. D at 1.[2]

After having Ms. Avery in their home for three-and-a-half months, on September 13, 2021, the Dorseys used their power of attorney to move her into Phoebe Berks, an assisted-living facility near Reading, Pennsylvania. Two months and one week later, on November 20, 2021, Ms. Avery left Phoebe Berks with her daughter, Mrs. Dorsey-Rosa, and went with her to New York. Thus, Ms. Avery was in Pennsylvania for approximately 178 days (from about May 26 through November 20), *i.e.*, five months and three weeks.

An administrator for Phoebe Berks, Michele Butch, expected Ms. Avery's trip to last a week, because the Dorseys, using their power of attorney, had only authorized Ms. Avery to leave the facility for a Thanksgiving visit. *See* N.T., 7/12/22, at 50, 95. However, on November 27, 2021, Ms. Avery called Phoebe Berks and told an employee that "she would not be returning." *Id.* at 52. She also called Mrs. Dorsey and informed her that she had moved in with Mrs. Dorsey-Rosa. *See id.* Mrs. Dorsey told Ms. Avery "she had to return" because of the Dorseys' "agreement" with Mrs. Dorsey-Rosa that she could only "take [Ms. Avery] for the holiday." *Id.*

---

[2] Ms. Avery had a combined monthly income of $3,601.00 from Social Security and her pension, as well as $164,500.00 in checking and various investments.

The following day, Ms. Butch called Ms. Avery. Ms. Avery again said she would not return to Pennsylvania. *See id.* at 53. Ms. Butch told her "she could not make that decision on her own, [because] she was deemed incapacitated by her doctor to make these decisions and that she needed to return." *Id.* Then, Mrs. Dorsey-Rosa got on the phone and said the power of attorney in favor of the Dorseys "was revoked." *Id.*

The next day, on November 29, 2021, Ms. Avery faxed letters to the Dorseys, which showed her address as 1850 Patterson Ave., Bronx, New York. Ms. Avery wrote, "This is notice to you that I have formally revoked the Power of Attorney given to you in June, 2021. You no longer have the authority to act for me." The Dorseys' Petition for the Appointment of Emergency Co-Guardians Ex. C at 1-2.

Ms. Avery also "signed a new power of attorney in favor of [Mrs. Dorsey-Rosa]." The Dorseys' Petition for the Appointment of Emergency Co-Guardians at 2; *see also* Dorsey-Rosa's Response to Petition for Appointment at 1. Mrs. Dorsey-Rosa therefore "refused to return [Ms. Avery] to Phoebe [Berks], and that went on for several weeks." N.T., 7/12/22, at 96.

On December 10, 2021, the Dorseys petitioned the Orphans' Court of Berks County to adjudicate Ms. Avery's capacity status and for the Dorseys to be appointed as co-guardians of her person and estate. *See id.* The orphans' court assigned the petition to Judge Jeffrey K. Sprecher, who scheduled a hearing on Ms. Avery's capacity status for December 21, 2021. Five days later, counsel for the Dorseys sent notice of the hearing "via overnight

delivery" to Mrs. Dorsey-Rosa and to Phoebe Berks, the business entity. Certificate of Service, 12/15/21, at 1. Phoebe Berks did not file a responsive pleading or participate in the orphans' court proceedings. Mrs. Dorsey-Rosa and Ms. Avery did not appear at the December 21, 2021 hearing.

The court issued a bench warrant for Mrs. Dorsey-Rosa's arrest, and, on December 22, 2021, she returned Ms. Avery to Phoebe Berks. *See* N.T., 7/12/22, at 51. Ms. Avery spent a total of 32 days in New York. *See id.* at 54. In the words of the Dorseys' counsel, "Judge Sprecher ordered [her] back into the Commonwealth." N.T., 11/19/24, at 10. Or, as Mr. Dorsey described the situation, Ms. Avery "was brought back to Phoebe [Berks] after the Judge ordered [Mrs. Dorsey-Rosa] to bring her back to Phoebe." N.T., 7/12/22, at 96. On December 27, 2021, the orphans' court vacated its bench warrant.

Next, Mrs. Dorsey-Rosa filed a Response to the petition for the appointment of emergency co-guardians, wherein she admitted most of the allegations. She denied that Ms. Avery was incapacitated. Mrs. Dorsey-Rosa alternatively pleaded that, if the orphans' court found Ms. Avery to be incapacitated, then the court should appoint Mrs. Dorsey-Rosa or a third-party to serve as her guardian.

Three months later, the orphans' court appointed counsel to represent Ms. Avery. Her counsel did not file a responsive pleading to the petition.

On July 12, 2022, the orphans' court held a hearing on the Dorseys' emergency petition, after which the court declared Ms. Avery's status to be an incapacitated person. Curiously, the court granted the status of permanent

Co-Guardians of Ms. Avery's estate and her person to the Dorseys, even though they had not sought a permanent guardianship.

Ms. Avery moved for reconsideration of the order. The orphans' court granted reconsideration and "scheduled a hearing on the matter for August 11, 2022[, which] was continued to October 18, 2022." *In re M.D.A.*, 2023 WL 8370234 at *4 (Pa. Super. 2023) (non-precedential decision). On the same day, Ms. Avery appealed to this Court. Following briefing and argument, we quashed her appeal as premature. *See id.* Meanwhile, Judge Sprecher retired, and the orphans' court reassigned this case to Judge James E. Gavin. He eventually denied reconsideration and denied a separate petition by Ms. Avery to have Mrs. Dorsey-Rosa substituted as her guardian.

Thereafter, the Dorseys petitioned for permission to charge Ms. Avery's estate $79,790.99. They sought reimbursement for all the "legal work that counsel has provided, first in pursuing the initial appointment of [the Dorseys] as Co-Guardians, and then in defending their appointment against a variety of ineffective challenges." The Dorseys' Petition for Payment of Attorneys' Fees at 5.

Ms. Avery filed an Answer and New Matter denying most allegations in the petition. She contended that the fees were "excessive and patently unreasonable" and she "does not have the financial means to pay such exorbitant fees as a result of [the Dorseys] using her financial resources in Phoebe Berks." *Id.* at 4. In New Matter, Ms. Avery averred that Pennsylvania law does not compel a ward to pay for her guardians' legal fees; the fees were

excessive; they were duplicative; and the petition was untimely, waived, and barred under the doctrine of laches. **See id.** at 5-7. The Dorseys filed a response denying Ms. Avery's New Matter.

On November 19, 2024, the orphans' court conducted a hearing on the petition for attorneys' fees and costs. Thad Gelsinger, Esq. testified that his former firm, Leisawitz Heller, represented the Dorseys when they commenced this proceeding. That firm assigned him as chief litigator and then merged with Barley Snyder LLP. **See** N.T., 11/19/24, at 7. Attorney Gelsinger moved to Barley Snyder and continued representing the Dorseys.

He explained how the firms calculated billable hours using software and indicated that the firms worked in teams of lawyers. This resulted in multiple billable hours for the same periods of time. He considered the hourly rates to be in the average range for the Berks County market. The court admitted the bills from the firms into evidence, and the Dorseys rested. Ms. Avery offered no evidence and called no witnesses.

Following briefing by the parties, the court denied the Dorseys' petition. This timely appeal followed.

Upon review of the Dorseys' docketing statement, this Court issued a rule to show cause, asking them why this appeal should not be quashed as interlocutory. **See** Superior Court Order, 3/12/25, at 1. In the Dorseys' reply, they conceded the appealed-from order was interlocutory, but they contended it was appealable under Pennsylvania Rule of Appellate Procedure 342(a)(5) ("An appeal may be taken as of right from . . . orders of the orphans' court .

. . determining the status of . . . creditors in an estate, trust, or guardianship . . . .").  This Court discharged its show-cause order and deferred the issue of appellate jurisdiction to this panel.  The parties filed briefs on our appellate jurisdiction and on the merits of the appeal.

After reviewing those briefs and the record, we noticed a potential issue as to whether South Carolina, Pennsylvania, or New York has jurisdiction over Ms. Avery's capacity status and guardianship.  Of particular concern was the fact that the orphans' court imposed a **permanent** guardianship, when the Dorseys only petitioned for a **temporary** one, and Ms. Avery was not present in Pennsylvania when this proceeding commenced.  **See** N.T., 7/12/22, at 95. Nor did she consider herself to be a Pennsylvanian, given her desire to remain with Mrs. Dorsey-Rosa in New York.[3]

_____

[3] **See In re Edmundson**, 167 A. 502, 503 (Pa. Super. 1933) (holding that "jurisdiction of the lower court depended on where [the respondent] 'resided' **at the time** the petition was presented and the proceedings were begun." (emphasis added)).  When we reviewed the record and the parties' briefs, we thought the law to be correctly stated as follows:

> **The residence of an incompetent person generally controls jurisdiction to appoint a guardian over his or her person** . . . Residence or legal settlement within the county or other territorial jurisdiction of the court is necessary for the appointment of a guardian over his or her person.  Jurisdiction for this purpose cannot be exercised, by a local court, over a resident of another county or state, even though such person may have property within the jurisdiction of the court.
>
> The alleged incompetent person must be [(1)] actually within the jurisdiction and [(2)] an actual resident

*(Footnote Continued Next Page)*

In light of a potential jurisdictional conflict among the three states, on January 12, 2026, we ordered supplemental briefing on whether "the Orphans' Court of Berks County lacks *in rem* jurisdiction over the incapacity status of Mary D. Avery to impose a plenary guardianship over the person of Ms. Avery . . . ." Superior Court Order, 1/12/26, at 1.

---

> thereof . . . a mere temporary presence or sojourn, particularly where the presence is involuntary, is insufficient. However, confinement of the incompetent person in an institution in another county or state does not change his or her domicile or residence and, therefore, does not affect the jurisdiction of the court of his or her actual domicile or residence over the appointment of a guardian.
>
> The terms 'residence' and 'domicile,' with respect to the court's jurisdiction, are synonymous.

57 C.J.S. Mental Health § 127 (March 2026 Update) (emphasis in original) (footnotes omitted); *see also* C.J.S., Domicile § 4 (accord). "Domicile within the county is a ***jurisdictional prerequisite*** to such a proceeding" regarding capacity status. *In re DuPuy's Est.*, 96 A.2d 318, 320 (Pa. 1953) (emphasis added).

Thus, "The court, upon petition and . . . presentation of clear and convincing evidence, may find a person ***domiciled*** in the Commonwealth to be incapacitated and appoint a guardian or guardians of his person or estate." 20 Pa.C.S.A. § 5511(a). *See In re Nicholls' Guardian*, 86 Pa. Super. 38 (1925) (holding that the Court of Common Pleas of Mercer County lacked jurisdiction to adjudicate a woman's status and impose a guardianship upon her, because she was domiciled with her husband in Allegheny County). "The court may find a person ***not domiciled*** in the Commonwealth, having property in the Commonwealth, to be incapacitated and may appoint a guardian of his estate." 20 Pa.C.S.A. § 5511(b) (emphasis added). "The court may also appoint an emergency guardian of the person [for 30 days] pursuant to this section for an alleged incapacitated person ***who is present*** in this Commonwealth ***but is domiciled outside*** of this Commonwealth . . . ." 20 Pa.C.S.A. § 5513 (emphasis added).

On February 10, 2026, the Dorseys filed a supplemental brief addressing the issue, statutes, and cases mentioned in our order. Mrs. Dorsey-Rosa filed a supplemental brief responding to the Dorseys' arguments. Ms. Avery joined Mrs. Dorsey-Rosa's brief. *See* Avery's 3/24/26 Letter to Superior Court.

Mrs. Dorsey-Rosa's supplemental brief raised a new issue: whether the Orphans' Court of Berks County lacks subject-matter jurisdiction under the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act ("UAGPPJA"). *See* 20 Pa.C.S.A. §§ 5901-5992. The Dorseys filed a reply brief to address Mrs. Dorsey-Rosa's claim that the UAGPPJA deprives the orphans' court of subject-matter jurisdiction.

### III. Analysis

This appeal raises the following issues:

1. Whether an orphans' court order denying a petition for reimbursement of legal fees from a ward's estate is immediately appealable as of right.

2. Whether the orphans' court lacks jurisdiction over this proceeding and, thus, all the orders it entered are void *ab initio*.

3. Whether the orphans' court erred by denying the Dorseys' petition for payment of attorneys' fees and costs.

*See* Superior Court Orders, 3/12/25 & 1/12/26; Dorsey-Rosa's Supplemental Brief at 1; *and* Dorseys' Brief at 4-5.[4]

---

[4] The Dorseys' Statement of Questions Involved in their initial brief raises a host of sub-issues regarding the denial of the petition for reimbursement of
*(Footnote Continued Next Page)*

- 10 -

*A.    Appellate Jurisdiction*

First, we consider whether this Court has appellate jurisdiction over the order denying the Dorsey's petition for reimbursement of attorneys' fees and costs out of Ms. Avery's guardianship estate. In their response to our rule to show cause, the Dorseys admitted the appealed-from order is interlocutory. However, they indicated that in *Est. of A.J.M.*, 308 A.3d 844 (Pa. Super. 2024), *appeal denied*, 325 A.3d 1024 (Pa. 2024), we deemed such an order to be immediately appealable under Pa.R.A.P. 342(a)(5).

Ms. Avery disagrees. She acknowledges that Rule 342(a)(5) allows a party to appeal an orphans' court order determining someone's status as a fiduciary, beneficiary, or creditor of an estate, trust, or guardianship. *See* Avery's Brief at 7. However, she thinks it is "problematic" that the Dorseys "suddenly characterize themselves as 'creditor[s]' of [her estate,] while they are serving as her financial guardian[s]." *Id.* at 8. This places the Dorseys in "incompatible positions." *Id.* Ms. Avery chiefly relies on *In re Est. of Liverant*, 2021 WL 630981 (Pa. Super. 2021) (non-precedential decision), where this Court quashed a cross-appeal from an orphans' court order refusing to award attorneys' fees and costs as a sanction against an opposing party.

---

attorneys' fees and costs out of Ms. Avery's estate. We do not list those sub-issues here, because the issue of attorneys' fees and costs is not pertinent to the jurisdictional question presently before us or our decision to remand this case. Still, we will retain jurisdiction over the Dorseys' appeal and may address the attorneys'-fees-and-costs issue and sub-issues, if necessary, after the orphans' court conducts an evidentiary hearing and returns the record to this Court.

Ms. Avery's argument focuses on the merits of whether the Dorseys may (or, on policy grounds, should) be both her guardians and her creditors. That merits-based argument is irrelevant to the appealability of an order. Under Rule 342(a)(5), in considering appellate jurisdiction, we must decide whether the appealed-from order **determined** that the Dorseys were or were not creditors of Ms. Avery's estate, not whether they are (or should be) creditors. Thus, Ms. Avery's public-policy concerns are unrelated to the question of an order's appealability.

The question of "appealability of an order goes to the appellate court's jurisdiction . . . ." **Whittaker v. Lu**, 323 A.3d 871, 874 (Pa. Super. 2024). "We may raise issues concerning our appellate jurisdiction *sua sponte*." **Commonwealth v. Gaines**, 127 A.3d 15, 17 (Pa. Super. 2015) (*en banc*). Jurisdiction is "a question of law; the appellate standard of review is *de novo*, and the scope of review is plenary." **Crespo v. Hughes**, 292 A.3d 612, 615 (Pa. Super. 2023).

This Court's "appellate jurisdiction extends to (1) a final order or an order certified by the trial court as a final order; (2) an interlocutory order as of right; (3) an interlocutory order by permission; (4) or a collateral order." **Whittaker**, 323 A.3d at 874–75.

Under prior versions of the Pennsylvania Rules of Appellate Procedure, a court's order was treated as final if "it effectively put the plaintiffs out of court, so far as their present claim is concerned." **Goldman v. McShain**, 247 A.2d 455, 457 (Pa. 1968) (cleaned up). In 1992, the Supreme Court of

Pennsylvania changed the definition of a final order "to make clear that, as a general rule, a final order is an order that ends a case as to **all** claims and **all** parties." Pa.R.A.P. 342 Note (emphasis added). Thus, the fact that an order put a party out of court no longer allowed the party to take an immediate appeal.

That change limited piecemeal appeals in most civil actions, which move naturally to final judgments. However, experience soon demonstrated that the new "final order" definition was unworkable in orphans' court divisions. **See id.** Because "administration of a trust or an estate continues over a period of time . . . traditional notions of finality that are applicable in the context of ongoing civil adversarial proceedings do not correspond to litigation in orphans' court." **Id.** A dispute may arise at any time "during the administration, and when it does arise, the dispute needs to be determined promptly and with finality, so that the guardianship or the estate or trust administration can then continue properly and orderly." **Id.**

To facilitate orderly and continuous administration of estates and trusts, the Supreme Court promulgated Rule of Appellate Procedure 342(a) which dictates, in pertinent part, as follows:

> An appeal may be taken as of right from the following orders of the orphans' court division:
>
> * * *
>
> (5) An order determining the status of fiduciaries, beneficiaries, or creditors in an estate, trust, or guardianship;

- 13 -

> (6)  An order determining an interest in real or personal
>        property . . . .

Pa.R.A.P. 342(a) (some capitalization omitted).

As Ms. Avery observes, in **Liverant**, **supra**, we stated that, "the order, which . . . denied the [cross-appellants'] requests for counsel fees associated with [opposing party's] attempt to remove their counsel, is not appealable under Pa.R.A.P. 342(a)(1)-(7)." **Id.**, 2021 WL 630981 at *7. However, **Liverant** is a non-precedential decision, and its holding is not binding upon this Court. **See** Pa.R.A.P. 126. Moreover, **Liverant** involved an attempt to get attorney's fees from an opposing party, personally, and not from an estate or trust. Thus, the appealed-from order was procedurally distinct from the one presently before us, because the order in **Liverant** did not determine the petitioners' status as a creditor of an estate or trust.

By contrast, **A.J.M.** involved an appealed-from order that determined that a law firm lacked status as a creditor of an estate. There, Mr. and Mrs. Madia hired The Lynch Law Group, LLC, because their adult sons were trying to sell the Madias' home under a power of attorney. When the sons learned the law firm was representing their parents, the sons petitioned the orphans' court to appoint them as guardians of Mr. Madia and his estate. The orphans' court granted the petition and allowed the sons to sell their parents' home. Lynch Law Group petitioned the orphans' court for allowance of legal fees and costs out of Mr. Madia's estate. The orphans' court denied the petition, and the law firm appealed.

Based on Pa.R.A.P. 342(a)(5), this Court concluded that it had appellate jurisdiction. We explained, "an orphans' court order determining if an individual or entity is a fiduciary, beneficiary or creditor, ***such as an order determining if the alleged creditor has a valid claim*** against the estate, is immediately appealable as of right." ***A.J.M.***, 308 A.3d at 850 (emphasis in original) (some punctuation omitted) (quoting Pa.R.A.P. 342(a) Note). The order "determined that [the law firm did] not have a valid claim regarding the legal fees and costs it allegedly incurred through its representation of [the Madias] in the guardianship proceedings." ***Id.*** Hence, the interlocutory order was immediately appealable, because it determined that the firm lacked legal status as a creditor of Mr. Madia's estate. Here, as in ***A.J.M.***, the appealed-from order is immediately appealable under Pa.R.A.P. 342(a)(5).

Additionally, the appealed-from order is immediately appealable under Pa.R.A.P. 342(a)(6). "An order [of the orphans' court] determining an interest in real or ***personal property***" is immediately appealable. Pa.R.A.P. 342(a)(6) (emphasis added). The phrase "personal property, when used in its ordinary (as well as in its legal) sense and meaning includes . . . cash." ***In re Lewis' Est.***, 180 A.2d 919, 921 (Pa. 1962).

The Dorseys' petition asserted a right to $79,790.99 in cash from Ms. Avery's estate accounts. By denying the Dorseys' petition, the orphans' court determined that they had no "interest in [the] personal property" – the cash – in Ms. Avery's accounts. Pa.R.A.P. 342(a)(6). Hence, the order is also appealable under Rule 342(a)(6). Thus, this Court has appellate jurisdiction

- 15 -

over an orphans' court order denying reimbursement of attorneys' fees and costs from an estate or trust.

B.      *Jurisdiction of the Orphans' Court*

Next, we turn to the issue of whether the Orphans' Court of Berks County has jurisdiction over Ms. Avery's capacity status and estate. The record suggested that Ms. Avery was not domiciled or present in Pennsylvania when the Dorseys filed their emergency petition for temporary guardianship. **See** Footnote 3, **supra**.

1.      The Parties' Arguments

In the Dorseys' supplemental brief, they agree with our understanding that 20 Pa.C.S.A. § 5511(a) requires a person, over whom an orphans' court imposes a permanent guardianship, to be domiciled in this Commonwealth. **See** Dorseys' Supplemental Brief at 8. They contend that Ms. Avery changed her domicile to Pennsylvania in May of 2021 when they moved her here from South Carolina. **See id.** at 10. Although, before leaving South Carolina, Mr. Dorsey told Ms. Avery the move was "temporary," the Dorseys claim he meant "temporary" in regards to Ms. Avery's "residence with [the Dorseys] and did not reflect any expectation or intent that Ms. Avery would return to South Carolina." **Id.** 10-11. Furthermore, the Dorseys believe the July 17, 2021 power of attorney in their favor "evince[s Ms. Avery's] intent to reestablish her permanent residence in Pennsylvania." **Id.** at 12.

Additionally, the Dorseys claim Ms. Avery chose to move into Phoebe Berks. **See id.** at 12. They argue that, on September 13, 2021, "she retained

capacity and therefore could have declined to move to the facility." *Id.* They state, "She could have selected a different retirement or assisted-living facility, or she could have chosen to return to South Carolina." *Id.*

Finally, the Dorseys claim, if Ms. Avery remained a South Carolinian, then she waived any challenge to the orphans' court's *in rem* jurisdiction over her capacity status by failing to raise the jurisdictional issue below. *See id.* at 25-26 (quoting *Sippel Development Co., Inc. v. Charter Homes at Hastings, Inc.*, 1485 WDA 2018, 2019 WL 4233848 at *3 (Pa. Super. 2019) (non-precedential decision) ("Whether a court has *in rem* jurisdiction is a question of personal jurisdiction, not subject-matter jurisdiction.")).  In the Dorseys' view, Ms. Avery entered a general appearance when she attended the hearing on their emergency petition for guardianship in July of 2022. Therefore, they believe we may not consider whether the orphans' court lacked *in rem* jurisdiction over her status and estate.

Mrs. Dorsey-Rosa's supplemental brief (in which Ms. Avery has joined) asserts that the Dorseys' reliance upon common-law rules of domicile and their allegations of waiver are misplaced.  Instead, Mrs. Dorsey-Rosa purports to challenge the subject-matter jurisdiction of the orphans' court under the UAGPPJA.  She claims that that Act "expressly provides the 'exclusive jurisdictional basis' for adult-guardianship proceedings . . . ." Dorsey-Rosa's Supplemental Brief at 7 (quoting 20 Pa.C.S.A. § 5912).  Mrs. Dorsey-Rosa argues that the UAGPPJA, a statutory mandate, is a legislatively imposed restriction on the subject-matter jurisdiction of the orphans' court.  "A court

that fails to satisfy the UAGPPJA's requirements has no judicial authority over the class of proceedings, regardless of the parties' conduct." *Id.* at 12.

Mrs. Dorsey-Rosa asserts that, the UAGPPJA has radically altered the jurisdictional landscape of adult-guardianship proceedings by "mov[ing] away from domicile as the jurisdictional touchstone" and replacing it with a tiered system of shared jurisdiction among enacting states. *Id.* at 17. In particular, Mrs. Dorsey-Rosa claims that South Carolina retained "home state jurisdiction" over Ms. Avery's status, because Ms. Avery was not present in Pennsylvania long enough to make Pennsylvania her home. In support of that contention, she indicates that the Dorseys only petitioned for a temporary guardianship, under 20 Pa.C.S.A. § 5513, based on a person being present in this Commonwealth but being domiciled in another state. Thus, Mrs. Dorsey-Rosa contends that the Dorseys conceded in their pleadings that Pennsylvania is not Ms. Avery's "home state." *See id.* at 18-22.

In the Dorseys' reply brief, they do not contest the assertion that the UAGPPJA governs the nonwaivable, subject-matter jurisdiction of orphans' courts over adult guardianship proceedings. Instead, the Dorseys argue that Pennsylvania has "home state jurisdiction" over Ms. Avery's status, because they filed their petition for guardianship on December 10, 2021, *i.e.*, more than six months after they moved Ms. Avery to Pennsylvania. *See* Dorseys' Reply Brief to Supplemental Brief at 2. They contend that, prior to leaving for New York in November of 2021, Ms. Avery "had resided in Pennsylvania for approximately six months," and they intended for her trip to New York to be

temporary. *Id.* at 3. The Dorseys assert that "Mrs. Dorsey-Rosa should not be permitted to create Ms. Avery's absence from the Commonwealth and then rely on it to claim Ms. Avery's absence from Pennsylvania was intended to be permanent." *Id.* at 4. Thus, the Dorseys believe that the time Ms. Avery spent in New York should count towards the six-month period necessary to make Pennsylvania Ms. Avery's home state.

If Pennsylvania lacks "home state jurisdiction," then the Dorseys assert that Ms. Avery had no "home state" under the UAGPPJA. Consequently, the Dorseys offer "significant-connection-state jurisdiction" as an alternative basis to uphold the orders of the orphans' court and imposition of this guardianship. They observe that, under that portion of the Act, an objection is specifically required to defeat jurisdiction. Because no one objected to the proceeding below, and because Pennsylvania is an "appropriate forum," as that phrase is used in the UAGPPJA, the Dorseys claim Pennsylvania is, at least, a significant-connection state. *Id.* at 8.

2. Review of *In Rem* and *Quasi In Rem* Jurisdiction

Typically, "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). An exception to Rule 302(a) is jurisdiction, because "this Court can raise jurisdictional issues *sua sponte*." **Commonwealth v. Valentine**, 928 A.2d 346, 349 (Pa. Super. 2007). However, that exception depends on the category of jurisdiction at issue. A court may raise certain jurisdictional issues *sua sponte*; others are waivable.

Mrs. Dorsey-Rosa contends the UAGPPJA implicates subject-matter jurisdiction, because it statutorily limits the various classes of adult-incapacity cases that orphans' courts may entertain. We, on the other hand, raised this jurisdictional inquiry over the orphans' court's lack of *in rem* jurisdiction,[5] due to the *res*[6] (namely, Ms. Avery's capacity status) being outside the territorial confines of Pennsylvania on the day the Dorseys commenced this proceeding. Thus, we begin with the threshold question of whether this Court may, *sua sponte*, raise the categories of jurisdiction at issue, because, as a general rule, "one may with impunity disregard the law pronounced by a magistrate beyond his [or her] territory." Joseph Story, J., COMMENTARIES ON THE CONFLICTS OF LAWS, FOREIGN AND DOMESTIC, ETC. § 8 at 8 (1834). The various jurisdictional categories arose from the need of courts' to ascertain the enforceability of judgments, especially against persons or things outside the territorial confines of the courts that issued them. **See id.**

In its broadest sense, "Jurisdiction relates to the court's power to hear and decide the controversy presented." **Commonwealth v. Gross**, 101 A.3d 28, 32 (Pa. 2014). Jurisdiction is divided into four overarching categories:

---

[5]  Latin, literally translating to "jurisdiction on the thing." A more idiomatic translation is "jurisdiction over the thing."

[6] Latin, literally translating to "the thing."

subject-matter jurisdiction, *in personam* jurisdiction,[7] *in rem* jurisdiction, and *quasi in rem* jurisdiction.[8] *See* 1 STANDARD PENNSYLVANIA PRACTICE 2d. §§ 2:84 – 2:119.

"Subject-matter jurisdiction is a question that is not waivable and may be raised by a court on its own motion." ***Domus, Inc. v. Signature Bldg. Sys. of PA, LLC***, 252 A.3d 628, 636 (Pa. 2021). "The assessment of whether a court has subject-matter jurisdiction inquires into the competency of the court to determine controversies of the general class to which the case presented for consideration belongs." ***Id.***

By contrast, *in personam* jurisdiction (a.k.a. personal jurisdiction) "is readily waivable." ***In re Est. of Forte***, 352 A.3d 1024, 1031 (Pa. Super. 2026), *reargument denied* (Apr. 7, 2026) (quoting ***Grimm v. Grimm***, 149 A.3d 77, 83 (Pa. Super. 2016), *disapproved of on other grounds by* ***Marion v. Bryn Mawr Tr. Co.***, 288 A.3d 76 (Pa. 2023)). Personal jurisdiction is a "court's power to bring a person into its adjudicative process; jurisdiction over a defendant's personal rights, rather than merely over property interests. — Also termed *in personam jurisdiction* . . . ." Personal Jurisdiction, BLACK'S LAW DICTIONARY (12th ed. 2024).

---

[7] Latin, literally translating to "jurisdiction on the person." A more idiomatic translation would be "jurisdiction over the person." The "courts may exercise two types of *in personam* jurisdiction over a non-resident defendant:" general and specific *in personam* jurisdiction. ***Mar-Eco, Inc. v. T & R & Sons Towing & Recovery, Inc.***, 837 A.2d 512, 515 (Pa. Super. 2003).

[8] Latin, literally translating to "jurisdiction as if jurisdiction were on the thing." A more idiomatic translation would be "pretend jurisdiction is over the thing."

As for *in rem* and *quasi in rem* jurisdiction, our research reveals no precedential decision where the Supreme Court of Pennsylvania or this Court has held that a party's failure to raise the lack of *in rem* jurisdiction, in the court purportedly lacking such jurisdiction, results in waiver of the jurisdictional defect. *In rem* jurisdiction is generally defined as a "court's power to adjudicate the rights to a given piece of property, including the power to seize and hold it. — Also termed *jurisdiction in rem*." *In Rem* Jurisdiction, BLACK'S LAW DICTIONARY (12th ed. 2024). *Quasi in rem* jurisdiction is "[j]urisdiction over a person but based on that person's interest in property located within the court's territory. — Also termed *jurisdiction quasi in rem*." *Quasi in Rem* JURISDICTION, BLACK'S LAW DICTIONARY (12th ed. 2024).

Unlike *in rem* judgments, an *in personam* judgment, arising from the *in personam* jurisdiction of the court over the parties before it, adjudicates the rights and obligations of only those parties. *See, e.g.*, *Bank of Pennsylvania v. G/N Enterprises, Inc.*, 463 A.2d 4, 6-7 (Pa. Super. 1983) (holding that "a proceeding by confession of judgment on the bond . . . is to obtain judgment against the obligor of the bond. This is a proceeding *in personam*;" thus, "judgment confessed on the bond, being *in personam* against the obligor, does not bind strangers to the [underlying action].") By contrast, an *in rem* judgment, arising from the *in rem* jurisdiction of a court over the *res*, adjudicates "forever the status of a thing, and [is] binding upon all the world." *In re Clark's Est.*, 119 A. 590, 591 (Pa. 1923); *see also* 46 Am. Jur. 2d Judgments § 163 (February 2026 Update) (accord).

"The best-known form of the judgment *in rem* is a judgment declaring the status of an individual:  as that such and such persons are married, or that [a person] is the administrator of the estate of a deceased person."  Sir Francis Piggott, 4 FOREIGN JUDGMENTS AND JURISDICTION:  JUDGMENTS *IN REM* § 1 at 6 (1908-1910) (footnote omitted).  Determinations of a person's status "are for the most part . . . of absolute obligation everywhere, when they have once attached upon the person by the law of his domicile."  Story, **supra** § 51 at 51.  Simply put, "a Frenchman is a Frenchman all the world over," because the "laws of [a] state affecting the personal status of [its citizens] travel with them wherever they go and attach to them in whatever country [or state] they are resident."  Piggott, 5 FOREIGN JUDGMENTS AND JURISDICTION:  STATUS at 62 (some punctuation and quotations omitted).

"That a question of status is involved in the law of lunacy [that is to say, incapacity] is obvious, for the conditions or quality of the person is affected:  and also, in one of its bearings, his relationship to some community."  **Id.** § 1 at 339.  The "legal position which [the incapacitated person] would otherwise hold in relation to other people as a person *sui juris* is curtailed."  **Id.** at 340.  Also, the court "invests another person with a status or representative position *vis a vis* that community – the guardian . . . ."  **Id.** at 339.

Other *in rem* actions determine the status of property.  "The basis of [*in rem*] jurisdiction over property is the presence of the subject property within the territorial jurisdiction of the forum state."  **Whitmer v. Whitmer**, 365 A.2d 1316, 1319 (Pa. Super. 1976).  Examples of *in rem* jurisdiction over

property include actions to quiet title, mortgage foreclosures, actions for partition, condemnations, and forfeitures.[9]

The Dorseys claim that Ms. Avery's failure to object to the lack of the orphans' court's *in rem* jurisdiction is waiver of the jurisdictional issue, similar to the result of a party's failure to object to a court's lack of *in personam* jurisdiction over that party. We disagree, because the reason for finding a waiver by a party in an *in personam* action does not correspond to the basis for jurisdiction in an *in rem* action.

At common law, a court obtained *in personam* jurisdiction over a party in two ways: by the individual being present in the state's geographic territory or by the individual consenting to a court's jurisdiction. Thus, "a state court's power over a person turned strictly on 'service of process within the state' (presence) 'or her voluntary appearance' (consent)." ***Mallory v. Norfolk Southern R.R.***, 600 U.S. 122, 175, (2023) (quoting ***Pennoyer v. Neff***, 95 U.S. 714, 733, (1878)).

If individuals over whom a court lacked *in personam* jurisdiction came into that court and did not immediately object to the court's alleged lack of *in*

---

[9] ***See Stefanick v. Minucci***, 333 A.2d 920, 922 (Pa. 1975) (indicating that quiet-title actions are *in rem*); ***Green Tree Consumer Disc. Co. v. Newton***, 909 A.2d 811, 815 (Pa. Super. 2006) ("mortgage foreclosure is strictly an *in rem* proceeding . . . solely to effect a judicial sale of the mortgaged property."); ***Whitmer v. Whitmer***, 365 A.2d 1316 (Pa. Super. 1976) (holding that an action to partition property is *in rem*); ***and In re One 1988 Toyota Corolla (Blue Two-Door Sedan) Pa. License TPV 291***, 675 A.2d 1290, 1294 (Pa. Cmwlth. 1996) ("proceedings for the forfeiture or condemnation of property . . . [are] *in rem*, in which the Commonwealth shall be the plaintiff ***and the property the defendant***.") (emphasis in original).

*personam* jurisdiction, they instantly submitted themselves and consented to the *in personam* jurisdiction of the court. As Chief Justice Marshall explained, "By appearing [generally], the defendants . . . placed themselves precisely in the situation in which they would have stood, had process been served upon them, and **consequently** waived all objections to the non-service of process." ***Pollard v. Dwight***, 8 U.S. 421, 428–29 (1808) (emphasis added). The waiver is the **consequence** of the person appearing without objecting and consenting to the court's *in personam* jurisdiction.

Unlike *in personam* jurisdiction, appearance by a party does not pertain to *in rem* jurisdiction and judgments, because courts do not exercise *in rem* jurisdiction over parties. Courts exercise *in rem* jurisdiction over a *res* and adjudicate the status of that *res* as against the entire world, not any particular party. Because a *res* is an inanimate object (property) or a legal concept (status), it cannot "place[ itself] precisely in the situation in which [it] would have stood, had process been served upon [it], and consequently waived all objections to the non-service of process." ***Id.*** A *res* cannot enter a general appearance in a court and thereby voluntarily submit itself to the *in rem* jurisdiction of that court.

In addition, the failure of a respondent in an *in rem* proceeding to object to jurisdiction cannot waive the jurisdictional issue on behalf of the entire world. Hence, the jurisdictional issue remains viable and subject to post-judgment collateral attack, including by persons who did not participate in the *in rem* action. Thus, the waiver-by-party-consent principle applicable to *in*

*personam* jurisdiction does not apply to the *res* of an *in rem* action. We offer several cases to illustrate the point.

Cases dating back to the founding of our federal government reveal that we have always treated the issue of *in rem* jurisdiction as non-waivable.[10] The Supreme Court of the United States first ruled that judgments are open to collateral attack based on a court's lack of *in rem* jurisdiction in the companion cases of **Hudson v. Guestier**, 8 U.S. 293 (1808) ("**Hudson I**"), and **Rose v. Himely**, 8 U.S. 241 (1808), *overruled on other grounds by* **Hudson v. Guestier**, 10 U.S. 281 (1810) ("**Hudson II**"). There, the High Court had to decide which court had *in rem* jurisdiction over the cargos of two American ships (*The Sea Flower* and *The Sarah*, respectively) that French privateers seized in the name of Emperor Napoleon Bonaparte.

During the Haitian War of Independence (1791-1804), both American ships broke French law by trading with the enslaved and rebelling people of Haiti, then, the French Colony of Saint-Domingue. Under French law, the ships and their cargo were guilty of smuggling and liable for condemnation, forfeiture, and judicial sale. In **Hudson I**, the privateers presumptively seized *The Sea Flower* within two leagues of the Haitian coastline. In **Rose**, the privateers seized *The Sarah* more than ten leagues off the coast, on the high

_____

[10] We are including this detailed history of *in rem* jurisdiction, because, as we explain below, our research has revealed no other court in the nation that has considered the UAGPPJA has yet to thoroughly analyze what type of jurisdiction the Act covers, and why a court may raise this jurisdictional issue *sua sponte*. As the history shows, when a *res* is moveable, jurisdiction moves with it.

seas (today, "in international waters"). The privateers transported both ships to the Spanish Colony of Cuba.

Mr. Himely purchased most of *The Sarah*'s cargo in Cuba and brought it to Charleston, South Carolina. A member of *The Sarah*'s crew, Mr. Rose, tracked down the cargo and sued Mr. Himely for restitution of the goods in federal district court. A few days later, a United States Marshall seized the cargo pending trial. Thus, possession of the *res* (namely, *The Sarah's* cargo) transferred from France to America.

When the French privateers learned of Mr. Rose's lawsuit and that the United States had seized the cargo, they filed an action against *The Sarah* in Saint-Domingue. Within a few weeks, the French court in Saint-Domingue issued a judgment condemning *The Sarah* and its cargo and declaring the *res* forfeited to the privateers. Therefore, if valid, the French judgment effectively granted title to *The Sarah*'s cargo to Mr. Himely by virtue of his prior purchase of the cargo in Cuba from the privateers. As a result, in the federal court, Mr. Himely claimed to be the lawful owner of the cargo based on the condemnation judgment of the French court.

By contrast, in **Hudson I**, *The Sea Flower* remained in Cuba, while the privateers who had seized the vessel commenced a condemnation proceeding in the French court at Guadeloupe. That court ruled in favor of the privateers, condemned *The Sea Flower* and its cargo, and sold the cargo to Mr. Guestier. When the original owners of *The Sea Flower*, Mr. Hudson and Mr. Smith, learned that Mr. Guestier thereafter resold their cargo, they sued him in the

United States District Court for Maryland to recover the price of the goods. Like Mr. Himely, Mr. Guestier asserted that his title to the cargo vested under the French judgment.

In **Hudson I** and **Rose**, the federal district courts ruled in favor of the original American owners of the cargos and against the people who purchased them from the French privateers. Both cases made their way to the Supreme Court of the United States.

The purchasers argued that the French courts impliedly ruled that they had *in rem* jurisdiction over the ships and their cargos. Otherwise, the French courts would not have sentenced the ships and their cargos to condemnation and forfeiture. The purchasers then contended that the judgments, being *in rem*, bound the whole world. Hence, the federal district courts needed to recognize the purchasers' titles to the cargos and enter directed verdicts in their favor.

Mr. Rose responded that the judgment of the Saint-Domingue court was unenforceable, because that court lacked jurisdiction over *The Sarah*'s cargo. He claimed that, because the United States Marshall had seized the cargo in South Carolina **before** the privateers commenced the condemnation action in Saint-Domingue, the cargo was no longer under the control or jurisdiction of France. In his view, by seizing the cargo, the federal agent had divested the French court of *in rem* jurisdiction.

Chief Justice Marshall delivered the lead opinion in **Rose**. He stated the primary and threshold issue as "Can this Court examine the jurisdiction of a

foreign tribunal?" **Rose**, 8 U.S. at 268. First, he explained that the Supreme Court had an obligation to determine whether the French court was "empowered by its government to take cognizance of the subject it had decided . . . ." *Id.* at 269. Was it a real court, and did it have subject-matter jurisdiction?

Additionally, the Supreme Court needed to decide whether the French court had *in rem* jurisdiction, because *in rem* jurisdiction arises solely from the ability of a court (or its sovereign) to seize and dispose of the *res*. If a court asserts jurisdiction over "a vessel which was never captured, it could not be contended that this condemnation operated a change of property . . . [thus], the capacity of the court to act upon the thing condemned, arising from its being within, or without their jurisdiction . . . may be considered by [a subsequent] tribunal which is to decide on the effect of" the original *in rem* judgment. *Id.* In deciding whether the French court had jurisdiction over *The Sarah* and its cargo, the Supreme Court examined "the constitutional powers of that tribunal, the character in which it acted, and the situation of the subject [*i.e.*, the *res*] **on** which it acted." *Id.* at 271 (emphasis in original).

In applying that test, the High Court unanimously held that the French court, being a court of general jurisdiction, had subject-matter jurisdiction to hear actions for condemnation and forfeiture of ships and cargo. Even so, a majority of the Justices held that the French court lacked *in rem* jurisdiction over *The Sarah*'s cargo, albeit for different reasons.

The Chief Justice and Justice Washington concluded that the French court never acquired jurisdiction over the *res*, because the privateers seized *The Sarah* in international waters. In their view, the statute under which the seizure occurred only extended to seizures within two leagues of the Haitian coastline. Notably, the Chief Justice raised that specific jurisdictional defect *sua sponte*.

Justices Livingston, Cushing, and Chase also concluded that the French court lacked *in rem* jurisdiction, because the privateers never conveyed *The Sarah* into any French port, and, when the privateers filed their action for condemnation of the cargo in Saint-Domingue, the cargo was already in South Carolina. Thus, the Supreme Court affirmed the decision of the district court to restore the cargo to Mr. Rose.

Justice Johnson dissented, but he agreed that the Court could consider whether "the subject [*i.e.*, the *res*] was *sub potestate* of the sovereign whose courts condemned it" in deciding whether to enforce the judgment of the French court. ***Id.*** at 285 (Johnson, J., dissenting). In Justice Johnson's view, whether French law allowed for the seizure of *The Sarah* in international waters was a question for the French court, not the Supreme Court of the United States. Because the French court had entertained the condemnation proceeding and entered its judgment, the French court necessarily found that the seizure of *The Sarah* was lawful under the French statute.

In **Hudson I**, by contrast, the parties did not litigate in the district court whether the privateers seized *The Sea Flower* more than two leagues off the

- 30 -

Haitian coast. Thus, it was assumed that the "vessel and cargo, which constitute the subject of controversy, were seized ***within the territorial jurisdiction of the government of St. Domingo*** and carried into a ***Spanish*** port" in Cuba. ***Hudson I***, 8 U.S. at 293 (emphasis in original). The only issue for decision was whether, by transporting the *res* into a Spanish port instead of a French port, the privateers divested the French court of *in rem* jurisdiction over the ship.

The Court explained that, if the privateers remained in possession of the ship and its cargo while in Cuba, "the *res* may be either restored [to the owner] or sold [to a purchaser; thus,] the sentence of the court can be executed; and therefore, this possession seems to be the essential fact on which the jurisdiction of the [French] court depends." ***Id.*** at 294. Because the privateers seized *The Sea Flower* lawfully and still possessed it at the time they commenced the condemnation proceeding in the French court, the French court had jurisdiction over the *res*. The Supreme Court therefore remanded the case, in light of its decisions in ***Rose*** and ***Hudson I***, for a new jury trial to determine where the seizure of *The Sea Flower* actually occurred.

Two years later, in ***Cheriot v. Foussat***, 3 Binn. 220, 1811 WL 1500 (Pa. 1811), the Supreme Court of Pennsylvania also reviewed the validity of a French court's *in rem* judgment. There, a French court had condemned *The Mars*, a New York ship, on the same charge of trading with the enslaved and rebelling Haitians. The facts were similar to those in ***Rose***, except that, when Mr. Cheriot, the New York owner of *The Mars*, found his ship anchored in Cuba,

Mr. Foussat had already purchased its cargo and taken it to Pennsylvania. Mr. Cheriot came to Philadelphia and sued Mr. Foussat to replevin the goods in the original jurisdiction of the Supreme Court of Pennsylvania.

In his answer, Mr. Foussat asserted an affirmative defense, namely, that he did not know the goods were the cargo of a seized, American ship. He therefore contended that he was a *bona fide* purchaser subsequent to the condemnation and forfeiture proceeding of *The Mars*.

Mr. Cheriot responded to the new matter. He claimed that the purchase was not *bona fide* and that the French court lacked *in rem* jurisdiction over *The Mars*. He argued that, like the ship in **Rose**, **supra**, the privateers had seized *The Mars* in international waters and, thus, the seizure occurred beyond the territorial reach of the French court.

Chief Justice Tilghman presided at the *nisi prius*. The jury returned a verdict in favor of Mr. Cheriot. It found that Mr. Foussat was not a *bona fide* purchaser and that the seizure of *The Mars* occurred in international waters.

Before the Supreme Court *en banc*, Mr. Foussat moved for a new trial on several grounds, including that the Pennsylvania court had to recognize and enforce the *in rem* judgment of the French court. **See id.**, 1811 WL 1500 at *11. Mr. Cheriot, relying on **Rose**, contended that the French court lacked *in rem* jurisdiction, and, therefore, its judgment of condemnation was void.

The Supreme Court began its opinion with the same threshold question as Chief Justice Marshall in **Rose**. "Has this Court a right to inquire into the jurisdiction of the court of another nation?" **Id.** at *14. Relying upon **Rose**

and **Hudson I**, as well as other cases from Pennsylvania and England, the Supreme Court held "we may inquire into the jurisdiction" of the French court. **Id.** This included Mr. Cheriot's claims that the French court lacked *in rem* jurisdiction over the *res*, because, in his view:

> 3.  The seizure was [outside] the territorial limits of the **French** republic.
>
> 4.  The property condemned was never brought within the **French** territory.

**Id.** at *15 (emphasis in original).

The Court analyzed all the collateral attacks against the French court's *in rem* jurisdiction and unanimously rejected them. Still, by undertaking the review, the Supreme Court necessarily accepted the rule of **Rose** and **Hudson I**:  that, an *in rem* judgment, without *in rem* jurisdiction over the *res*, is void *ab initio*, and may be reviewed at any time.

Well into the 20th century, this Court continued to rely on **Rose** to hold that questions of *in rem* jurisdiction are not waivable. We addressed such jurisdictional claims, even where the party against whose *res* the judgment was entered appeared and failed to raise the jurisdictional issue in the court issuing the *in rem* judgment. Rather than finding waiver, this Court treated those *in rem* judgments as void *ab initio* and unentitled to enforcement.

The clearest example of this was **Whitmer**, **supra**, which involved a couple who moved from Pennsylvania to Florida and established domicile there. Husband retained a home and business in Pittsburgh. The following

year, wife filed for a divorce in Florida. Husband entered his general appearance and opposed the case on the merits.

The Florida court eventually dissolved the marriage and awarded wife one-half interest in the assets of the husband's Pittsburgh business. The order stated that the judgment "shall act as a conveyance" of the Pennsylvania property to wife. **Whitmer**, 365 A.2d at 1318. Husband did not object to the Florida court's lack of *in personam* jurisdiction over him or its lack of *in rem* jurisdiction over his Pennsylvania property. Additionally, he failed to appeal the Florida judgment.

Next, wife filed an action to partition husband's business in the Court of Common Pleas of Allegheny County based on Florida's "conveyance" of an undivided half-interest in husband's business to wife. Husband responded that the Florida judgment was void *ab initio*, because (1) the Florida court lost *in personam* jurisdiction over him by striking his pleadings and (2) the court lacked *in rem* jurisdiction over his Pennsylvania property. The Pennsylvania trial court dismissed wife's petition, and she appealed.

First, we agreed with wife that the Florida court did not lose *in personam* jurisdiction over husband. "Once [*in personam*] jurisdiction has attached it exists for all times until the cause is fully and completely determined." **Id.** at 1319. *In personam* jurisdiction, once submitted to and waived, is "not lost by the court's action in striking [husband's] pleadings and proceeding *ex parte* or by the withdrawal of [his] counsel, actual or threatened." **Id.** Thus, "the

Florida court had jurisdiction over the parties . . . and . . . its judgment is entitled to full faith and credit in the courts of Pennsylvania." *Id.*

Regarding the Florida court's jurisdiction over Pennsylvania property, however, we, citing to *Rose*, *supra*, and other cases of the Supreme Court of the United States, concluded that the Florida court's *in rem* judgment was unenforceable. We opined as follows:

> [The *in personam*] jurisdiction of the Florida court over the person of [husband] did not give it jurisdiction *in rem* over his property located outside the state of Florida. The basis of jurisdiction over property is the presence of the subject property within the territorial jurisdiction of the forum state. *Hanson v. Denckla*, 357 U.S. 235, 246, (1958); *Overby v. Gordon*, 177 U.S. 214, 222, (1900); *Rose v. Himely*, 8 U.S. 241, 277, (1808). Plainly it was beyond the jurisdiction of the Florida court to make a conveyance to appellant of a one-half interest in [husband's] Pennsylvania property.
>
> Having personal jurisdiction over [husband], the Florida court might have ordered [him] to convey a one-half interest in his Pennsylvania property to [wife] and, if necessary, enforce its order by contempt proceedings. Presumably, it did not do so, because [husband] was not physically to be found within the state of Florida. The court might also have followed through on the stipulation [that husband] was to convey the Pennsylvania assets to a trustee who would hold them subject to the order of the court. For some unexplained reason, this stipulation was never acted upon.
>
> But instead of acting through [husband,] over whom it had jurisdiction, the Florida court elected to proceed *in rem* against the Pennsylvania property by purporting to make a conveyance of a one-half interest in it to [wife]. This was beyond its power as ruled in *Hanson* and numerous other cases. Its purported conveyance was a nullity and cannot be given full faith and credit by a Pennsylvania court.

- 35 -

*Id.* Because the Florida court exceeded its *in rem* jurisdiction, the Florida judgment conveyed no interest in the Pennsylvania property to wife. Hence, this Court affirmed the order of the court of common pleas dismissing wife's action to partition the property.

We have applied the same concepts to incapacity proceedings, where a court of common pleas lacked *in rem* jurisdiction over a person's status to declare him weak-minded (*i.e.*, incapacitated).[11] **See In re Edmundson**, 167 A. 502 (Pa. Super. 1933) ("**Edmundson I**"). There, in 1931, First National Bank ("FNB") petitioned the Allegheny County trial court to declare Mr. Edmundson a weak-minded individual and to appoint FNB the guardian of his person and estate.[12] **See In re Edmundson**, 173 A. 708, 709 (Pa. Super. 1934) ("**Edmundson II**"). The court granted FNB's petition.

Two years later, Irwin Savings & Trust Company ("ISTC") petitioned to vacate the orders of incapacity and guardianship, because Mr. Edmundson

---

[11] At the time, the law drew a distinction between "weak-minded" individuals and "lunatics." Our statutes still define "lunatic" as "An individual of unsound mind." 1 Pa.C.S.A. § 1991. **See also** "Insane person," 1 Pa.C.S.A. § 1991. The "weak-minded" were people with mental disabilities from birth with no hope of obtaining their full mental faculties, while "lunatics" were people who became mentally afflicted after reaching the age of majority.

[12] **Edmundson** predated the legislature's decision to transfer jurisdiction over incapacity proceedings and guardianships from the trial courts to the orphans' courts. Under "the Orphans' Court Act of 1951 . . . the Orphans' Court acquired concurrent jurisdiction over the appointment of guardians of the estates of 'incompetents' and the administration of their estates." Neal G. Wiley, *A Brief History of the Pennsylvania Orphans' Court*, July 2019 PENNSYLVANIA BAR ASSOC. QUARTERLY 134, 142 (2019).

was not domiciled in Allegheny County. Therefore, ISTC asserted that the trial court never had jurisdiction over Mr. Edmundson's status or estate.[13] FNB demurred based on the 1931 judgment of weak-mindedness as being a final judgment against the whole world. The trial court granted the demurrer and refused to entertain ISTC's petition.

On appeal, we reversed and remanded for an evidentiary hearing, because there was a factual dispute as to whether, in 1931, Mr. Edmundson "was a resident of Allegheny County or of Westmoreland County; and [the] niceties of pleading should not govern in passing on such a ***jurisdictional requirement***." ***Edmundson I***, 167 A. at 503 (emphasis added). The then-existent statute on guardianships established:

> a jurisdictional requirement that the petition for such appointment be presented to the [trial] court . . . of the county in which said person to be cared for resides. By this is not meant the place where he may be sojourning at the time the petition is presented, but his established place of abode, his permanent dwelling place, [which] is practically synonymous with "domicile."

***Id.*** (citing ***In re Nicholls' Guardian***, 86 Pa. Super. 38, 39 (1925); and C.J. § 3 at 703). "The jurisdiction of the [trial] court depended on where [Mr.

---

[13] Neither ***Edmundson I*** nor ***Edmundson II*** identifies which category of jurisdiction that ISTC claimed the trial court lacked. Nevertheless, given that Mr. Edmundson was subject to a guardianship for two years and that ISTC challenged the jurisdiction based on Mr. Edmundson being domiciled in Westmoreland County, ISTC's attack was clearly on the *in rem* jurisdiction of the Allegheny County court. Although the dispute here involved two different counties, not states, the issue was not one of venue, but jurisdiction, based on the guardian statute at the time.

Edmundson] 'resided' at the time the petition was presented and the proceedings were begun. If this was [in] Westmoreland County, then the Court of Common Pleas of Allegheny County had no jurisdiction . . . ." *Id.* (some capitalization added).

Following remand and an evidentiary hearing, the Court of Common Pleas of Allegheny County ruled that it lacked *in rem* jurisdiction over Mr. Edmundson's status when FNB filed its guardianship petition in 1931. *See* *Edmundson II*. The court vacated all its prior orders in the case. ISTC then filed for appointment of itself as Mr. Edmundson's guardian in the Court of Common Pleas of Westmoreland County. That court granted ISTC's petition, and FNB appealed. We affirmed. *See id.*

Based on *Cheriot*, *Edmundson I* and *Whitmer*, *supra*, it is clear that THE RESTATEMENT OF JUDGMENTS § 32, Com. b (1942) accurately reflects the law in Pennsylvania.[14] "A judgment purporting to create or determine

---

[14] As mentioned, the Dorseys rely upon *Sippel Dev. Co. v. Charter Homes at Hastings, Inc.*, 1485 WDA 2018, 2019 WL 4233848 (Pa. Super. 2019) (non-precedential decision), to contend that the issue of *in rem* jurisdiction as waived. In that non-binding decision, we said, "Whether a court has *in rem* jurisdiction is a question of personal jurisdiction, not subject-matter jurisdiction." *Id.* at *3. *Sippel* was half-right. *In rem* jurisdiction is not subject-matter jurisdiction. However, *in rem* jurisdiction is also not a question of *in personam* jurisdiction, as *Whitmer v. Whitmer*, 365 A.2d 1316 (Pa. Super. 1976), clearly demonstrates.

The *Sippel* Court relied upon *Commonwealth v. Perez*, 941 A.2d 778, 781 (Pa. Cmwlth. 2008), for the proposition that *in rem* jurisdiction is a type of personal jurisdiction and, therefore, is waivable. Notably, "this Court is not bound by decisions of the Commonwealth Court." *Petow v. Warehime*, 996
*(Footnote Continued Next Page)*

interests in a thing **is void** if it was rendered by a court of a state which had no jurisdiction over the thing." **Id.** (emphasis added). "Void judgments are to be treated in the same way that they were treated at common law, *i.e.*, at any time that a void judgment is brought to the attention of the court, it **must be stricken**." **M & P Mgmt., L.P. v. Williams**, 937 A.2d 398, 402 (Pa. 2007) (emphasis added). "It is certainly true that a void judgment may be regarded as no judgment at all; and every judgment is void, which clearly appears on its own face to have been pronounced by a court having no jurisdiction . . . ." **Id.** at 401.

Because a judgment without jurisdiction is no judgment at all (**see Whitmer**, **supra**), a court's lack of *in rem* jurisdiction over the *res*, like lack of subject-matter jurisdiction, is a non-waivable issue that this Court may raise *sua sponte*. It is far more efficient to vacate such void judgments immediately when noticed, rather than await for someone to attack them collaterally in subsequent proceedings.

The same result pertains to *quasi in rem* jurisdiction, because actions are *quasi in rem* if they are "brought against persons [but] seek to subject certain property of those persons to the discharge of the claims asserted." **Commonwealth, by Hilbert v. Lutz**, 60 A.2d 24, 27 (Pa. 1948). Thus, like

---

A.2d 1083, 1089 (Pa. Super. 2010). In so far as **Perez** stated that *in rem* jurisdiction is a type of *in personam* jurisdiction and is waivable, **Perez** conflicts with **Cheriot v. Foussat**, 3 Binn. 220, 1811 WL 1500 (Pa. 1811); **Edmundson I**; and **Whitmer**, **supra**, all of which bind this panel. Those cases were equally binding on the **Sippel** Court. Thus, **Sippel**'s reliance upon **Perez** to dismiss an *in rem* jurisdictional challenge as waived was misplaced.

*in rem* jurisdiction, no court can assert *quasi in rem* jurisdiction over the *res*, if it is located outside the state. Accordingly, our conclusion that the issue of whether a court lacked *in rem* jurisdiction is non-waivable and may be raised by this Court *sua sponte* applies with equal force to *quasi in rem* actions.

3.      The Category of Jurisdiction in the UAGPPJA

Having determined that we may raise, *sua sponte*, the issues of subject-matter, *in rem*, and *quasi in rem* jurisdiction, we must now ascertain what category of jurisdiction the UAGPPJA governs. If the Act governs one of those three categories, then Mrs. Dorsey-Rosa has properly raised the UAGPPJA for the first time on appeal to contend that orders of the orphans' court are void *ab initio*. Conversely, if the UAGPPJA governs *in personam* jurisdiction, then Ms. Avery waived the UAGPPJA by failing to object to the lack of *in personam* jurisdiction before the Orphans' Court of Berks County. ***See Forte***, ***supra***.

"As these issues require statutory interpretation, our standard of review is *de novo*, and our scope of review is plenary." ***Crown Castle NG E. LLC v. Pennsylvania P.U.C.***, 234 A.3d 665, 674 (Pa. 2020). "When engaging in statutory construction, a court's duty is to give effect to the legislature's intent and to give effect to all of a statute's provisions." ***Id.*** (citing 1 Pa.C.S.A. § 1921(a)). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b).

In 2007, the Uniform Law Commission ("ULC") drafted and proposed the UAGPPJA for state legislatures to adopt. ***See*** ULC, "Adult Guardianship and

Protective Proceedings Jurisdiction Act," available at https://www.uniformlaws.org/committees/community-home?CommunityKey=0f25ccb8-43ce-4df5-a856-e6585698197a (last visited 4/15/26).

According to Professor David English, Reporter for the ULC committee that drafted the UAGPPJA, "Although many uniform acts never take off, the UAGPPJA has been a major success. Through 2021, the Act has been enacted in 46 states and the District of Columbia." David English, *Jurisdictional Conflicts in Adult Guardianship*, 97 TUL. L. REV. 743, 780 (2023). In 2025, Kansas adopted the Act; Florida, Michigan, and Texas are the remaining holdouts. **See** ULC, "Adult Guardianship and Protective Proceedings Jurisdiction Act: Legislative Bill Tracking," available at https://www.uniformlaws.org/committees/community-home?CommunityKey=0f25ccb8-43ce-4df5-a856-e6585698197a#LegBillTrackingAnchor (last visited (4/15/26). Thus, the Act is on the verge of becoming a truly national law.

The General Assembly of Pennsylvania enacted the UAGPPJA in 2012. Since then, no Pennsylvania appellate court has had occasion to interpret the Act's jurisdictional provisions. Even so, in a case regarding acts of a California-appointed guardian in Pennsylvania under the UAGPPJA, we recognized that the ULC "drafted the [UAGPPJA] to specifically address jurisdiction and related issues in adult guardianship and protective proceedings . . . ." **McIlwain v. Saber Healthcare Grp., Inc., LLC**, 208 A.3d 478, 483 (Pa. Super. 2019).

"Notwithstanding any inconsistent provisions of Chapter 55 [of Title 20] (relating to incapacitated persons), [the UAGPPJA] provides the exclusive jurisdictional basis for a court of this Commonwealth to appoint a guardian or issue a protective order for an adult." 20 Pa.C.S.A. § 5912. By the plain and unambiguous language of Section 5912, upon enactment of the UAGPPJA, the legislature repealed all jurisdictional requirements in the chapter pertaining to adult-incapacity proceedings and guardianships. The subsequent section of the UAGPPJA then provides a list of scenarios, based on its newly created forms of "jurisdiction," that dictate if and when a "court of this Commonwealth has jurisdiction to appoint a guardian or issue a protective order for a respondent . . . ." 20 Pa.C.S.A. § 5913.

Unfortunately, the ULC and General Assembly did not define or clearly indicate what category of "jurisdiction" the UAGPPJA governs. *See* 20 Pa.C.S.A. § 5902 (not defining "jurisdiction"). The General Assembly also did not define "jurisdiction" in 1 Pa.C.S.A. § 1991. This was a major oversight on the part of the UAGPPJA drafters when authoring a statute specifically on interstate "jurisdiction," because "[j]urisdiction, it has been observed, is a word of many, too many, meanings . . . ." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90, (1998) (quotation omitted). BLACK'S LAW DICTIONARY contains four primary definitions for "Jurisdiction" and over 80 sub-definitions. *See* Jurisdiction, BLACK'S LAW DICTIONARY (12th ed. 2024). The sub-definitions include the four major categories discussed above.

By writing a jurisdictional statute without defining "jurisdiction" as "subject-matter," "*in personam*," "*in rem*," or "*quasi in rem,*" the ULC and our legislature have not clearly or plainly stated what jurisdiction the UAGPPJA governs. Due to the definitional lacuna in the UAGPPJA, the Uniform Act is patently ambiguous. "Jurisdiction" simply has too many meanings for us to ascertain what category of jurisdiction the drafters intended the Act to govern based solely on their use of the word "jurisdiction."

When a statute's wording is ambiguous, "the intention of the General Assembly may be ascertained by considering, among other matters:

   (1)   The occasion and necessity for the statute.

   (2)   The circumstances under which it was enacted.

   (3)   The mischief to be remedied.

   (4)   The object to be attained.

   (5)   The former law, if any, including other statutes upon the same or similar subjects.

   (6)   The consequences of a particular interpretation.

   (7)   The contemporaneous legislative history.

   (8)   Legislative and administrative interpretations of such statute."

1 Pa.C.S.A. § 1921(c).

Importantly, the legislature has commanded that uniform laws, like the UAGPPJA, "shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them." 1 Pa.C.S.A. § 1927. "In applying and construing [the UAGPPJA], consideration must be

given to the need to promote uniformity of the law with respect to its subject matter among states that enact it."  20 Pa.C.S.A. § 5991.

In their briefs, the parties do not cite any out-of-Commonwealth cases on the UAGPPJA.  Still, we begin our search for the meaning of "jurisdiction" in the UAGPPJA by examining how other courts have construed that term when applying the Act and determining whether it is a non-waivable jurisdiction. Our research reveals that most of the appellate courts to consider the question hold that the issue is non-waivable and that they may raise the UAGPPJA *sua sponte*.

Ten years ago, the question of the UAGPPJA and waiver first arose in **Guardianship of Sanders**, 143 A.3d 795, 798 (Me. 2016).  The Supreme Court of Maine held, "Although [the incapacitated person] did not raise this issue [of UAGPPJA jurisdiction] before the probate court, jurisdiction can be raised at any time, and we review a jurisdictional question *de novo*."  While the Maine court did not indicate which category of jurisdiction is at issue in the Act, other courts subsequently have.  **See In re Est. of Kusmanoff**, 83 N.E.3d 1144, 1167 (Il. App. 5th. Dist. 2017) (stating the UAGPPJA presents a question of "subject-matter jurisdiction"); **In re Est. of Hanson**, 848 S.E.2d 204, 206 (Ga. App. 2020) (accord); **In re M.E.**, No. 22-ICA-189, 2023 WL 7203355 at *2 (W.Va. App. 2023) (non-precedential decision) (permitting an appellant to raise UAGPPJA "subject-matter jurisdiction" for the first time on appeal); **In Int. of Diaz**, 560 P.3d 434, 445 (Co. App. Div. V 2024) (reading Colorado's Probate Code and UAGPPJA *in pari materia* and holding that the

two statutes govern the "subject matter jurisdiction over adult guardianship proceedings . . . ."); *In Matter of Hickey*, 1 CA-CV 23-0578, 2024 WL 4357415 at *3 (Az. App. Div. I 2024) (non-precedential decision) (reading Arizona's Probate Code and UAGPPJA *in pari materia* and holding that "the [trial] court has subject matter jurisdiction to adjudicate all issues relating to the protection of incapacitated persons . . . if Arizona is the respondent's 'home state'" under the UAGPPJA).

Most recently, the Supreme Court of New Hampshire held that "New Hampshire's enactment of the [UAGPPJA] governs whether a New Hampshire court, rather than another state's court, may exercise subject matter jurisdiction over an adult guardianship petition." *In re Guardianship of K.S.*, 2024-0467, 2025 WL 3119105 at *1 (N.H. 2025) (publication in official reports pending). That court stated that an appellate court "may also raise [the issue] *sua sponte*." *Id.*

By contrast, in *Williams v. Jeffcoat*, 906 S.E.2d 588 (S.C. 2024), the Supreme Court of South Carolina concluded that the UAGPPJA does not govern "jurisdiction" at all. In *Willliams*, Mr. Jeffcoat and Ms. Perkins began living together in a Charleston, South Carolina home. They never married. In 2000, Mr. Jeffcoat purchased their home and deeded it to himself and Ms. Perkins as joint tenants, with right of survivorship. In 2015, Ms. Perkins' health declined due to dementia, and her daughter moved to Charleston from Alabama and began assisting Mr. Jeffcoat in caring for Ms. Perkins.

Five weeks later, the daughter took Ms. Perkins back to Alabama without Mr. Jeffcoat's knowledge. In July 2015, she petitioned the Alabama probate court to declare Ms. Perkins incapacitated and to appoint her as Ms. Perkins' guardian and conservator of her estate. The daughter did not notify Mr. Jeffcoat of the Alabama proceeding. Likewise, she did not inform the Alabama court of Mr. Jeffcoat's existence or that Ms. Perkins had lived in South Carolina for 15 years. The probate court granted the daughter's petition.

On November 16, 2015, the daughter, as conservator of Ms. Perkins' estate, deeded Ms. Perkins' half interest in the Charleston home to herself. The daughter then commenced an action of partition in the Court of Common Pleas of Charleston County to force a judicial sale of Mr. Jeffcoat's home. Two days later, Ms. Perkins died. Thereafter, the daughter obtained a decree from the Alabama court that "retroactively approve[d] the prior transfer of the property" in South Carolina. *Id.* at 592.

The daughter and Mr. Jeffcoat filed cross-motions for summary judgment in the South Carolina court. That court ruled that, as a matter of law, (1) the daughter severed the joint tenancy when she conveyed a half interest in the home to herself and (2) she had an absolute right to partition. But, partitioning the home into sellable purparts was impossible; hence, a judicial sale of the home was required.

On appeal, Mr. Jeffcoat, for the first time, collaterally attacked the Alabama court's jurisdiction based on the UAGPPJA. He contended that, under the UAGPPJA, the probate court lacked subject-matter jurisdiction over the

guardianship proceeding, because daughter did not serve him with notice of the petition pursuant to the Act's "Jurisdiction" Section.[15]

The intermediate appellate court agreed with Mr. Jeffcoat that the "Jurisdiction" Section of the Act governs subject-matter jurisdiction of probate courts. Thus, he could raise the issue of UAGPPJA jurisdiction for the first time on appeal, as a collateral attack on the Alabama judgment. Nevertheless, the appellate court held that, under the Act, Mr. Jeffcoat "was not entitled to notice of the Alabama guardianship and conservatorship proceedings and" Alabama had jurisdiction over Ms. Perkins' capacity status, because it was "a significant-connection state." *Id.* The appellate court affirmed the grant of summary judgment to daughter in all respects.

Mr. Jeffcoat petitioned the Supreme Court of South Carolina for a writ of *certiorari*. That court granted review of several issues, including whether "the Alabama probate court had subject matter jurisdiction over [the daughter's] petition for appointment as [Ms.] Perkins' guardian and conservator." *Id.* at 593. Mr. Jeffcoat raised an additional new argument in the supreme court, *i.e.*, that Alabama was not a "significant-connection state" under the UAGPPJA.

Concluding that the "Jurisdiction" Section of the Act does not govern "jurisdiction," much less "subject-matter jurisdiction," the supreme court dismissed both arguments as waived. The **Williams** Court opined as follows:

---

[15] **See** Ala. Code § 26-2B-203.

> [The "Jurisdiction" Section of the UAGPPJA] merely outlines the circumstances in which Alabama probate courts have the ***"authority" or "power" to act*** in a given guardianship and/or conservatorship proceeding and does not confer the general power, *i.e.*, subject matter jurisdiction, to hear guardianship and conservatorship proceedings as a class . . .
>
> Because [the "Jurisdiction" Section of the UAGPPJA] is not the statute conferring subject matter jurisdiction on the Alabama probate court, any nonconformity with that statute cannot be attacked for the first time on appeal. The notice issue and the significant-connection-state issue both arise under [that] section. Because neither issue was raised to the [trial court], and because neither issue affects subject matter jurisdiction, we affirm the court of appeals as modified on that issue.

*Id.* at 596–97 (some punctuation and citations omitted) (emphasis added). As explained below, we agree with the Supreme Court of South Carolina that the "Jurisdiction" Section of the UAGPPJA does not govern "subject-matter jurisdiction" of orphans' and probate courts. However, we do not agree that the Act governs the "authority" and "power" of those courts.

Admittedly, most courts to face this issue have held that the UAGPPJA governs the subject-matter jurisdiction of probate courts. But none explained why the Uniform Act governs that category of jurisdiction. So, the persuasive authority of those decisions comes solely from the fact that we are construing a uniform statute, which we must interpret in a manner that affords it uniform application across the country. ***See*** 1 Pa.C.S.A. § 1927; ***and see also*** 20 Pa.C.S.A. § 5991. After all, the purpose of a uniform law is to avoid conflict-of-laws problems. ***See*** Roger J. Traynor, C.J., *Is this Conflict Really Necessary?*, 37 TEX. L. REV. 657, 664 (1959).

Even so, like South Carolina and Alabama law, Pennsylvania law holds that subject-matter jurisdiction is very specific. That "jurisdiction inquires into the competency of the court to determine controversies of the **general class** to which the case presented for consideration belongs." **Domus**, 252 A.3d at 636 (emphasis added). The question of subject-matter jurisdiction is not whether the Act permits the orphans' court to decide **this** case. Rather, it is whether the Act permits the orphans' court to decide cases **like** this case.

The General Assembly of Pennsylvania has enumerated general classes of cases over which the orphans' court divisions of the courts of common pleas must or may exercise jurisdiction. Those provisions are in Chapter 7 of the Decedents, Estates, and Fiduciaries Code ("DEF Code"). Upon adopting the UAGPPJA, our legislature limited the extent to which the Act repealed prior jurisdictional provisions to Chapter 55 of the DEF Code. **See** 20 Pa.C.S.A. § 5912. Thus, the jurisdictional provisions in Chapter 7 remain operative.

Section 711 of the DEF Code lists the classes of cases over which the orphans' court divisions must exercise the general jurisdiction of the courts of common pleas. **See** 20 Pa.C.S.A. § 711. Similarly, 20 Pa.C.S.A. § 712 lists the classes of cases over which the orphans' court division may exercise the general jurisdiction of the courts of common pleas. The cases over which an orphan's court has subject-matter jurisdiction include "**(10) Incapacitated persons' estates. –** The administration and distribution of the real and personal property of the estates of incapacitated persons . . . ." 20 Pa.C.S.A. § 711. In addition, the legislature has granted the orphans' court division

permission to assert jurisdiction over cases involving "**(2) Guardian of person. –** The appointment, control, and removal of the guardian of the person of any incapacitated person." 20 Pa.C.S.A. § 712.

Read together, Sections 711 and 712 of the DEF Code are the subject-matter-jurisdictional statutes for the orphans' courts of Pennsylvania. Thus, we agree with the Supreme Court of South Carolina that the UAGPPJA does not govern the subject-matter jurisdiction of probate and orphans' courts. However, the history of capacity proceedings as *in rem* actions, the language of the UAGPPJA, the drafting notes of the ULC, and the remedial purposes of the Act cause this Court respectfully to disagree with the Supreme Court of South Carolina's conclusion that the "Jurisdiction" Section "merely outlines the circumstances in which probate [or orphans'] courts have the 'authority' or 'power' to act in a given guardianship" proceeding. **Williams**, 906 S.E.2d at 597.

In our view, the "Jurisdiction" Section of the UAGPPJA governs jurisdiction – specifically, the same category of jurisdiction that our legislature originally vested on orphans' courts in Chapter 55 of the DEF Code – *in rem* jurisdiction. Originally, the "jurisdictional requirement" throughout Chapter 55 was that the *res* be in the territorial limits of **the county** of the court of common pleas asserting jurisdiction over a respondent's capacity status or property. **Edmundson I**, 167 A. at 503. Under law dating back to Ancient Rome, the rule has always been that the *lex domicilii* (that is, the "law of the

home that one inhabits") dictated an individual's status to all the world. As Justice Story explained:

> personal capacity or incapacity, attached to a party by the law of his domicil, is deemed to exist everywhere, (*qualitas personam sicut umbra sequitur*)[16] so long as his domicil remains unchanged, even in relation to transactions in a foreign country [or state], where they might otherwise be obligatory. Thus, a minor . . . [or] a person *non compos mentis* [*i.e.*, mentally incapacitated person] or other person, who is deemed incapable of transacting business (*sui juris*) in the place of his or her domicil, will be deemed incapable everywhere, not only as to transactions in the place of his or her domicil, but as to transactions in every other place.

Story, **supra** § 65 at 64-65 (some punctuation omitted). Because a judgment of incapacity is against the *res* of a person's status and is binding against the whole world, the judgment has always been and remains *in rem*. **See also** Piggott (Book 4), **supra**.

Pennsylvania's legislature incorporated the common law of domicile into the incompetency proceedings of the DEF Code. Because a proceeding to adjudicate a person's status always involved *in rem* jurisdiction, the legislature tied the statutory jurisdiction to whatever *res* could be found in Pennsylvania. The greater presence of the *res* created greater jurisdiction for the court.

For example, if a person was domiciled in Pennsylvania, the jurisdiction of the orphans' court over that person's status was absolute. "The court, upon petition and . . . presentation of clear and convincing evidence, may find a

---

[16] Latin, literally translating to, "Quality follows a person like his shadow." In other words, a persons' capacity, either *sui juris* or not, follows that person all over the world.

person **domiciled** in the Commonwealth to be incapacitated and appoint a guardian or guardians of his person or estate." 20 Pa.C.S.A. § 5511(a).

If the person was not a Pennsylvanian but owned property here, the orphans' court's *in rem* jurisdiction was confined to the *res* that the person owned in the Commonwealth. "The court may find a person **not domiciled in the Commonwealth, having property in the Commonwealth**, to be incapacitated and may appoint a guardian of his estate." 20 Pa.C.S.A. § 5511(b) (emphasis added). In that situation, the court could only appoint a guardianship over the property that the person owned in Pennsylvania and not over the person.

Finally, if the person was only here transitorily, then the orphans' court had temporary *in rem* jurisdiction over the person's status to care for that person while the person was in the Commonwealth. "The [orphans'] court may also appoint an emergency guardian of the person [lasting 30 days] pursuant to this section for an alleged incapacitated person **who is present** in this Commonwealth **but is domiciled outside** of this Commonwealth." 20 Pa.C.S.A. § 5513 (emphasis added). Therefore, each statutory, "jurisdictional requirement" in Chapter 55 was an *in rem* requirement. **Edmundson I**, 167 A. at 503.

Moreover, a report from the ULC committee on the UAGPPJA makes clear that, when the committee wrote "jurisdiction," the committee said what it meant and meant what it said. According to Professor English's committee report, the "Jurisdiction" Section:

> is the heart of the Act, specifying which court has jurisdiction to appoint a guardian or conservator.  Its overall objective is to **limit jurisdiction** to the courts of one and only one state except in cases of emergency or in situations where the individual owns property in multiple states.

David English, "Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act Report" at 2-3 (March 1, 2007), available for download at https://www.uniformlaws.org/viewdocument/committee-archive-34?CommunityKey=0f25ccb8-43ce-4df5-a856-e6585698197a&tab=librarydocuments (last visited 4/20/26) (emphasis added).  "The title of the UAGPPJA, Uniform Adult Guardianship and Protective Proceedings **Jurisdiction** Act, explains the scope of the Act . . . The Act addresses **only issues related to _jurisdiction_** and the Act applies only to adult proceedings."  English, 97 TUL. L. REV. at 779 (emphasis added).

Nothing in the notes of the drafting committee indicates that the authors of the Act intended it merely to outline the circumstances in which a probate or orphans' court has "authority" or "power" to act in a given guardianship proceeding.  The "Jurisdiction" Section of the Act speaks only of "jurisdiction," not "authority" or "power."

"[A]uthority and jurisdiction are not synonymous."  **Domus**, 252 A.3d at 638.  "[A]uthority relates to the ability of the decision-making body to order or effect a certain result."  **Stadium Casino RE, LLC v. Pennsylvania Gaming Control Bd.**, 318 A.3d 789, 800 (Pa. 2024).  Presumably, if the ULC intended the UAGPPJA to govern the "authority" and "power" of probate and orphans' courts, the drafters would have named it the Uniform Adult

Guardianship and Protective Proceedings *Authority* Act. Because the drafters used the word "jurisdiction," not "authority," we interpret the UAGPPJA as governing jurisdiction and not authority.

In fact, the drafters intended the Act to avoid a host of jurisdictional problems, as Professor English illustrates in his article, *Jurisdictional Conflicts in Adult Guardianship*. *See* English, 97 Tᴜʟ. L. Rᴇᴠ. at 745-48 (discussing *In re Guardianship of Parker*, 189 P.3d 730 (Okla. Civ. App. 2008), and *In re Guardianship of Parker*, 275 S.W.3d 623 (Tex. App. 2008), (conflicting decisions that both Oklahoma and Texas had jurisdiction over Ms. Parkers' capacity status and estate); *In re Guardianship of Jane E.P.*, 700 N.W.2d 863 (Wis. 2005), (refusing to extend jurisdiction over an incapacitated person and her estate, because she was domiciled in Illinois, even though everyone in her family lived in Wisconsin and wanted to move her there); *and In re Prye*, 169 S.W.3d 116 (Mo. Ct. App. 2005), (voiding the act of an Illinois agency, as guardian of an incapacitated person, to move him to a St. Louis hospital for necessary treatment, because the Missouri trial court ruled that the Illinois guardianship was not entitled to full faith and credit). Surely, all of the courts in those cases had "authority" and "power" to act, even though some refused to do so. The difficulties that the parties faced in those cases were the *in rem* jurisdictional struggles between the states.

Due to confusing, excess litigation and conflicting jurisdictional rulings between competing states in modern society (where people can now fly or drive around the country and may own houses in one or more states), the

drafters of the UAGPPJA found the law of domicile to be outdated and unable to keep up with the pace of life in the 21st century. They therefore proposed a statute that would hopefully create a national scheme for determining which state or territory has jurisdiction over a person's capacity and guardianship estate. *See id.*

The ULC committee opted for "a priority system" among the UAGPPJA-enacting states, where the states pass the *res* down a "cascade" from one state to the next, in order of legislative preference. *Id.* at 782-83. Thus, rather than spending time trying to determine which state has the *res* of the person's capacity status, based on the domicile test and the person's intent to remain in a particular place, the Act offers tiered-state jurisdictions. "The respondent's 'home state' has the highest priority, followed by a 'significant-connection state.' Only if the respondent's home state and all significant-connection states have declined to exercise jurisdiction may another state hear the case." *Id.* at 783.

Hence, although the UAGPPJA changed the nomenclature and created a uniform jurisdictional test across all enacting states, the category of jurisdiction that the Act governs remains unchanged from the common law. The UAGPPJA has subsumed governance of *in rem* jurisdiction from Chapter 55 of the DEF Code (and, indeed, from the prior statutes or common laws of all states and territories to adopt the Act). Our holding today adheres to the long-standing law that a proceeding involving the capacity status of a person is an *in rem* action, binding against the whole world, **provided that** the court

issuing the judgment had *in rem* jurisdiction over the *res*. **See Edmundson I**, ***supra***; ***see also*** Story, ***supra***; ***and see also*** Piggott (Book 5), ***supra***.

By not dismissing this issue as waived, we effectuate the intent of the legislature that a uniform law, like the UAGPPJA, "shall be interpreted and construed . . . to make uniform the laws of those states which enact them." 1 Pa.C.S.A. § 1927. We reach the same result as most appellate courts that considered this question. In concluding that the Uniform Act governs *in rem* jurisdiction and that such judgments are void *ab initio* due to lack of jurisdiction over the *res*, we align appellate application of the UAGPPJA in Pennsylvania with its appellate application in Arizona, Colorado, Georgia, Illinois, Maine, New Hampshire, and West Virginia. Moreover, by holding that application of the Act is reviewable *sua sponte*, we can better implement the priority jurisdictional system that the UAGPPJA authors and adopting legislatures intended to establish throughout the country. Otherwise, we would allow acquiescence of the parties (or their failure to raise the UAGPPJA in the orphans' court) to disrupt the priority system of jurisdiction that the adopting state legislatures intended us to enforce.

We hold that, because the UAGPPJA governs the *in rem* jurisdiction of courts, this Court may, *sua sponte*, raise the issue of whether the Orphans' Court of Berks County had jurisdiction over Ms. Avery's capacity status.

4. <u>Application of the UAGPPJA</u>

The UAGPPJA takes a "cascade approach" to determining which state has *in rem* jurisdiction over a person's capacity status and estate. English, 97

TUL. L. REV. at 783. States that adopted the Uniform Act have created cooperative, jurisdictional tiers among themselves.

The *res* is no longer stuck in one state, and multiple states do not have to compete for jurisdiction over it.[17] Instead, the *res* flows down the UAGPPJA tiers from higher-priority states into lower-priority states. The jurisdictional priorities, from highest to lowest, are: "1) the court in the respondent's home state; 2) the court of a state with which the respondent has a significant connection; or 3) a third state that is neither the home state nor a significant-connection state." ***Steen-Jorgensen v. Huff***, 835 S.E.2d 707, 709 (Ga. App. 2019).

According to the UAGPPJA, an orphans' court has jurisdiction over an adult respondent's capacity status and estate if:

    (1)   This Commonwealth is the respondent's home state.

    (2)   On the date the petition is filed, all of the following subparagraphs apply:

        (i)   This Commonwealth is a significant-connection state.

        (ii)  One of the following clauses applies:

            (A)  The respondent does not have a home state, or a court of the respondent's home state has declined to exercise jurisdiction because this Commonwealth is a more

---

[17] Indeed, Chief Justice Traynor denounced the historical fight between states over an elusive, fictional *res*. "Insofar as courts remain given to asking 'Res, res – who's got the *res*?,' they cripple their evaluation of the real factors that should determine jurisdiction." Roger J. Traynor, C.J., *Is this Conflict Really Necessary?*, 37 TEX. L. REV. 657, 663 (1959).

appropriate forum or has declined to exercise jurisdiction in a manner []consistent with a determination that this Commonwealth is a more appropriate forum.

(B) The respondent has a home state; a petition for an appointment or order is not pending in a court of that state or another significant-connection state; and, before the court makes the appointment or issues the order:

(I) a petition for an appointment or order is not filed in the respondent's home state;

(II) an objection to the court's jurisdiction is not filed by a person required to be notified of the proceeding; and

(III) the court in this Commonwealth concludes that it is an appropriate forum under the factors set forth in section 5916 (relating to appropriate forum).

(3) All of the following subparagraphs apply:

(i) This Commonwealth does not have jurisdiction under either paragraph (1) or (2).

(ii) The respondent's home state and all significant-connection states have declined to exercise jurisdiction because this Commonwealth is the more appropriate forum or has declined to exercise jurisdiction in a manner not inconsistent with a determination that this Commonwealth is a more appropriate forum.

(iii) Jurisdiction in this Commonwealth is consistent with the Constitution of the United States and the Constitution of Pennsylvania.

(4) The requirements for special jurisdiction under section 5914 (relating to special jurisdiction) are met.

20 Pa.C.S.A. § 5913. Based on the above statutory language, we must determine whether, on the date the Dorseys filed their emergency petition for temporary guardianship, Pennsylvania (1) was Ms. Avery's home state, (2) was a significant-connection state for her, or (3) was a tertiary-jurisdictional state. If so, then the Orphans' Court of Berks County had *in rem* jurisdiction over Ms. Avery's status and her estate.[18]

The state with the highest jurisdictional priority is the "home state" of the person whose capacity status is at issue. ***See id.*** "Home state" is an idiomatic translation of the Latin word, *domicilium*.[19] A person's domicile retains primary jurisdiction over that person's capacity status and estate.

At common law, the test for domicile is fact intensive and potentially unclear due to the decisive element being a person's intent. "By the term 'domicile' . . . is meant the place where a person lives or has his home. In a strict and legal sense, that [location] is properly the domicile of a person,

---

[18] We note that the UAGPPJA confers "Special Jurisdiction" on orphans' courts to "appoint a guardian in an emergency for a term not exceeding 90 days for a respondent who is physically present in this Commonwealth." 20 Pa.C.S.A. § 5914(a). Because Ms. Avery was not physically present in this Commonwealth when the Dorseys filed their petition for the emergency guardianship, the orphans' court lacked *in rem* jurisdiction under Section 5914.

[19] The Latin *domicilium*, the nominative form of *domicilii*, is a compound word of "*domus*," meaning "home," and "*colere*," meaning "to inhabit." Thus, the *lex domicilii* is the law of the home state or territory that a person inhabits. As a result, to determine that a place is a person's "home state" is to locate that person's domicile. The UAGPPJA idiomatically translated *domicilium* into the plain English phrase of "home state."

where he has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, he has the ***intention*** of returning." ***In re Dorrance's Est.***, 163 A. 303, 310 (Pa. 1932) (quoting Story, ***supra*** § 41 at 39) (punctuation and emphasis added); ***see e.g.***, ***Nicholls' Guardian***, ***supra***.

The UAGPPJA amended the common-law test of domicile by defining "home state." The statutory definition focuses on the time a person has spent in a state in the six months leading up to the filing of a guardianship petition. A person's "home state" is one of the following:

> (1) The state in which the respondent was physically present, including any period of temporary absence, for at least six consecutive months immediately before the filing of a petition for a protective order or the appointment of a guardian.
>
> (2) If the requirement of paragraph (1) is not met, the state in which the respondent was physically present, including any period of temporary absence, for at least six consecutive months ending within the six months prior to the filing of the petition.

20 Pa.C.S.A. § 5911.

Based on that definition, to ascertain if and where Ms. Avery had a home state, we examine where she was "physically present" for the six months prior to the date when the Dorseys filed their emergency petition for temporary guardianship. ***Id.*** In other words, "only relatively recent presence counts." English, 97 TUL. L. REV. at 783. "Under the definition of 'home state,' the six-

month physical presence requirement is fulfilled or not on the date the petition is filed."  20 Pa.C.S.A. § 5913 Note:  Uniform Law Comment.

Here, the Dorseys filed their emergency petition for temporary co-guardianship on December 10, 2021.  Because the "home state" requirement for Pennsylvania to have primary *in rem* jurisdiction over Ms. Avery's status was either "fulfilled or not on the date the petition [was] filed," we must decide whether Ms. Avery was physically present here for at least six consecutive months, including temporary absences, on December 10, 2021.  ***Id.***  If "in any statute the lapse of a number of months . . . before a certain day is required, such number of months shall be computed by counting the months from such day, excluding the calendar month in which such day occurs, and shall include the day of the month in the last month so counted having the same numerical order as the day of the month from which the computation is made . . . ."  1 Pa.C.S.A. § 1910.  Thus, the six-month period leading up to the filing of the Dorseys' petition began on June 10, 2021, inclusive of June 10.

Ms. Avery was physically present in Pennsylvania on June 10, 2021, because Mr. Dorsey told Mrs. Dorsey-Rosa that he went to South Carolina on May 19, 2021.  ***See*** N.T., 7/12/22, at 138.  Furthermore, Mr. Dorsey testified that he and his wife spent a week in South Carolina before bringing Ms. Avery to Pennsylvania.  ***See id.*** at 89.  Based on Mrs. Dorsey-Rosa and Mr. Dorsey's combined testimony, Ms. Avery arrived in Pennsylvania on or around May 26, 2021.  Thus, she was present in this Commonwealth by the start of the six-

month period prior to the filing of the Dorseys' emergency petition for co-guardianship.

Critically though, Ms. Avery did not remain in Pennsylvania until the filing of the Dorseys' petition. She left for New York on November 20, 2021. Counting backwards from Ms. Avery's departure date, six months prior was May 20, 2021. *See* 1 Pa.C.S.A. § 1910.

The Dorseys went to South Carolina on May 19, 2021 and were there for about a week before bringing Ms. Avery to Pennsylvania. Thus, it is impossible that Ms. Avery could have been in Pennsylvania on or before May 20, 2021, the first day of the six-month period to make Pennsylvania her home state. Instead, Ms. Avery was physically present in Pennsylvania for around 178 days – five months and three weeks. When Ms. Avery left for New York, she was one week short of the six months that would have made Pennsylvania her home state under the UAGPPJA. *See* 20 Pa.C.S.A. § 5911.

Nevertheless, the Dorseys contend that Ms. Avery's week trip to New York for Thanksgiving should count as the fourth week of her sixth month in Pennsylvania, because they intended for her trip to be a "temporary absence" from Pennsylvania. *Id.* The Dorseys cite no law to support that contention, and our research has revealed no case from another jurisdiction to hold that the intent of guardianship petitioners can alter the facts of the case. Furthermore, the UAGPPJA does not define "temporary absence," nor does it indicate who decides if a person's absence from a state was intended to be temporary or permanent.

Nothing in the UAGPPJA indicates that a person's would-be guardians may unilaterally declare that the person's absence from a state will or will not be temporary. On the other hand, nothing in the Act indicates that a family member may remove a person from a state against that person's will. Therefore, there is nothing in the UAGPPJA that answers (or even considers) whether the rights or wishes of the Dorseys to keep Ms. Avery in Pennsylvania rise any higher than the rights or wishes of Mrs. Dorsey-Rosa to take Ms. Avery to New York.

When applying the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), upon which the jurisdictional provisions of the UAGPPJA are based, this Court held that whether there was a "temporary absence" from an alleged "home state" "depends on the nature of [one's[20]] presence in Pennsylvania — whether it was **intended** to be temporary or permanent." **R.M. v. J.S.**, 20 A.3d 496, 506 (Pa. Super. 2011) (emphasis added); **see also** English, 97 TUL. L. REV. at 775–77.

Thus, the UAGPPJA has not fully replaced the intent element of the *lex domicilii*. We hold that the principles of domicile still apply under the UAGPPJA, in so far as the respondent is the person who decides if his or her absence from a state is intended to be "temporary." 20 Pa.C.S.A. § 5911. In other words, a person's "home state" is still "where he has his true, fixed, permanent home, and principal establishment, and to which, whenever he is

---

[20] In the UCCJEA, the "person" whose intent matters is the child's parent, because a minor is not yet a person *sui juris*.

absent, he has the **_intention_** of returning." **_Dorrance's Est._**, 163 A. at 310. (quoting Story, **_supra_** § 41 at 39) (emphasis added). If the person departs from a state alleged to be his or her "home state" before the six-month period vests plenary *in rem* jurisdiction in a state (as Ms. Avery did here), then whether that person's departure was temporary or permanent is a matter of that person's intent.

Moreover, as in all questions of domicile, whether a person intended to leave a state permanently or temporarily and whether the person was in possession of her faculties to make such a decision are questions of fact for the orphans' court. As we explained in the context of a child-custody proceedings under the statute that inspired the UAGPPJA, "If there is to be a determination that the move [from] Pennsylvania was only temporary, this cannot be determined by the pleadings, but only after a hearing with testimony from [the individuals involved] and after the judge has made credibility findings." **_Bouzos-Reilly v. Reilly_**, 980 A.2d 643, 646 (Pa. Super. 2009). Thus, "it is the obligation of the [orphans'] court to make its own determination as to whether the move [to New York] was temporary after hearing relevant witnesses . . . [because] there is **_no_** clear cut home state according to the language of [the Act,] unless there is a finding that [Ms. Avery's] move was only temporary." **_Id._** (emphasis in original).

Accordingly, we must remand this case to the orphans' court to decide, as sole finder of fact, whether Ms. Avery intended her trip to New York to be a "temporary absence" or to establish a new domicile. **_See R.M._**, 20 A.3d at

508. If the orphans' court finds that Ms. Avery intended her trip to be temporary, then Pennsylvania became her home state while she was in New York, and the orphans' court has jurisdiction over Ms. Avery's capacity status to impose a permanent guardianship. In that case, the orphans' court is directed to return the record to this Court, so we may consider the merits of the Dorseys' appeal.

On the other hand, if the orphans' court finds that Ms. Avery intended to abandon Pennsylvania for New York, then Pennsylvania was never her home state, and, under the Act, she had none. **See id.** In that case, we direct the orphans' court to make findings of fact relevant to and to weigh the factors for other potential grounds of Pennsylvania jurisdiction under the UAGPPJA that the Dorseys asserted in their Reply Supplemental Brief to this Court,[21] as well as any other facts the parties wish to introduce regarding the Act. The orphans' court will make credibility determinations and factual findings under the UAGPPJA's other jurisdictional provisions and return the record to this Court.[22] Then, we will apply the facts as found to the Act to determine the jurisdiction of the orphans' court, as a matter of law.

---

[21] **See** 20 Pa.C.S.A. § 5916 (regarding "Appropriate Forum" Factors).

[22] For conducting the evidentiary hearing, we recommend **Steen-Jorgensen v. Huff**, 835 S.E.2d 707 (Ga. App. 2019), as persuasive authority to the orphans' court and the parties. In that decision, the Georgia appellate court explains the step-by-step process for applying the UAGPPJA's jurisdictional tiers. For additional guidance, we recommend Professor English's law review article on the Act, *Jurisdictional Conflicts in Adult Guardianship*, 97 Tul. L. Rev. 743 (2023).

Case remanded for an evidentiary hearing with instructions.

Jurisdiction retained.

Judge Lane joins this Opinion.

Judge McLaughlin concurs in result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 06/16/2026